[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14525
_____

D.C. Docket No. 8:15-cv-00840-MSS-TBM


ROSEANN MICHELLE GILL,
as Parent and Next Friend of K.C.R., a minor,

Plaintiff-Appellant,

versus

GRADY JUDD,
individually and in his official capacity as the Sheriff of Polk County,
JONATHAN MCKINNEY,
individually,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(October 21, 2019)

Before ED CARNES, Chief Judge, MARTIN, and ANDERSON, Circuit Judges.

ED CARNES, Chief Judge:

The death of a child is tragic, doubly so if it is suicide.  And still more so if the child was driven to take her life by the bullying of other children.  The first two levels of tragedy are undisputed in this case: a twelve-year-old girl, we'll call R.S., deliberately ended her young life.  Members of the Polk County, Florida Sheriff's Department thought that R.S. took her life because she had been harassed and bullied by some of her sixth-grade classmates.  Following an investigation, a deputy arrested one of those classmates, whom we will call K.C.R.  She had once been R.S.'s best friend, but she found herself charged with having committed the crime of aggravated stalking, a felony, which includes harassing a child under sixteen years of age.  The warrantless arrest took place inside K.C.R's home.

The presumption of innocence proved apt in K.C.R's case.  The aggravated stalking charge against her was eventually dismissed, but not before the sheriff released K.C.R.'s name and photograph to the media and repeatedly and publicly blamed her for the death of R.S.  As one might imagine, that had a devastating effect on K.C.R.  She filed a lawsuit under 28 U.S.C. § 1983, naming as defendants the sheriff and a deputy who had entered her home and arrested her.[1]

The district court dismissed most of K.C.R.'s claims, including the claim that the deputy lacked probable cause to arrest her.  The court granted summary

---

[1]  Because K.C.R. as a minor had to sue through a parent or legal guardian, her mother brought the lawsuit for her.  For ease of reference, we'll refer to the plaintiff as K.C.R. instead of as K.C.R.'s mother or some other variation.

2

judgment against K.C.R. on one of her two remaining claims.  K.C.R.'s last surviving claim, which went to the jury, was that deputies entered her house without a warrant (undisputed) and without consent (disputed) and thereby violated her Fourth Amendment rights.  The sole question for the jury was whether the arresting deputy had consent to enter K.C.R.'s house.  The jury found that he did.

This is K.C.R.'s appeal challenging the dismissal of her claim that there was no probable cause for the arrest and challenging the judgment entered on the jury's verdict that the deputy had consent to enter her home to make the arrest.

## I.  PROCEDURAL HISTORY

K.C.R. filed this lawsuit in federal district court in April 2015.  She claimed that the sheriff's deputy who arrested her, Jonathan McKinney, violated her Fourth Amendment right to be free from unreasonable searches and seizures both because he did not have probable cause to arrest her and because he did not have consent to enter her home.  She also claimed that Sheriff Grady Judd and his office had an unconstitutional policy of encouraging the kind of warrantless home arrests she had experienced.  There were also various state-law claims, but none of them is relevant to this appeal.

The district court dismissed some of K.C.R.'s claims under Federal Rule of Civil Procedure 12(b)(6), including her Fourth Amendment claim that McKinney lacked probable cause to arrest her.  The court also granted summary judgment to

3

the sheriff on K.C.R.'s unlawful policy claim.  That left for trial only her Fourth Amendment claim that Deputy McKinney did not have consent to enter K.C.R.'s house and arrest her without a warrant.  It was tried to a jury.  Because the district court had already determined that McKinney had probable cause to make the arrest, the jury had only one question to answer:  "Did the Defendant Jonathan McKinney enter Plaintiff's house without consent in violation of Plaintiff's civil rights?"  The jury answered:  "No."

K.C.R. contends that the district court committed three reversible errors. First, she contends that it erred by dismissing her claim that McKinney did not have probable cause to arrest her.  Second, she challenges the sufficiency of the evidence for the jury to find that McKinney had consent to enter her house and also contends that the district court erred by denying her motions for judgment as a matter of law and for a new trial based on insufficient evidence.  And third, she contends that the district court abused its discretion when it denied her motions for a new trial and for a mistrial based on the answers that the judge had given to some questions the jury asked during deliberations.  We will address those contentions in that order.

## II.  THE DISMISSAL ISSUES

We review de novo the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) of K.C.R.'s claim that McKinney did not have probable cause

4

to arrest her.  See Butler v. Sheriff of Palm Beach Cty., 685 F.3d 1261, 1265 (11th

Cir. 2012).  The question we must answer is whether K.C.R.'s operative

complaint — the amended one, which we will simply refer to as "the complaint" –

– alleged sufficient facts to state a plausible claim that McKinney lacked probable

cause for the arrest.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

While we accept the factual allegations in the complaint as true, construing them in

the light most favorable to the plaintiff, the allegations must state a claim for relief

that is plausible, not merely possible.  See Butler, 685 F.3d at 1265.  Under this

standard, "[t]hreadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009).

In considering whether the district court properly dismissed the claim

asserting a lack of probable cause, we do not look to any of the evidence submitted

in connection with the summary judgment motion or introduced at trial.  That

evidence all came later and the dismissal of a claim under Rule 12(b)(6) is to be

judged for correctness at the time the dismissal took place.

### A.  Consideration Of The Affidavit Attached To The Complaint

In deciding whether a complaint states a claim upon which relief may be

granted, we normally consider all documents that are attached to the complaint or

incorporated into it by reference.  The Civil Rules provide that an attachment to a

complaint generally becomes "part of the pleading for all purposes," Fed. R. Civ. P. 10(c), including for ruling on a motion to dismiss.  See Hoefling v. City of Miami, 811 F.3d 1271, 1277 (11th Cir. 2016) (stating that a "court can generally consider exhibits attached to a complaint in ruling on a motion to dismiss . . . ."); Saunders v. Duke, 766 F.3d 1262, 1270 (11th Cir. 2014) ("[D]ocuments attached to a complaint or incorporated in the complaint by reference can generally be considered by a federal court in ruling on a motion to dismiss under Rule 12(b)(6)."); Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1199 (11th Cir. 2007) ("We are required to accept the facts as set forth in the plaintiff's complaint as true, and our consideration is limited to those facts contained in the pleadings and attached exhibits.").

The rule that attached exhibits are to be considered part of the complaint when ruling on its sufficiency usually benefits the plaintiff, but not always.  As our predecessor court warned nearly 80 years ago, a "litigant may be defeated by his own evidence, the pleader by his own exhibits" when "he has pleaded too much and has refuted his own allegations by setting forth the evidence relied on to sustain them."  Simmons v. Peavy-Welsh Lumber Co., 113 F.2d 812, 813 (5th Cir. 1940) (emphasis added).[2]  In the Parkerson case, for example, the Court explained:

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

6

"This complaint is plagued not by what it lacks, but by what it contains. All of the paths to relief which the pleading suggests are blocked by the allegations and the attached documents themselves, without more." Gen. Guar. Ins. Co. v. Parkerson, 369 F.2d 821, 825 (5th Cir. 1966) (emphasis added). That is what happened in the Parkerson case, and it is what has happened here.

Under the Florida Rules of Criminal Procedure, when a warrantless arrest is made and the defendant is held in custody, a non-adversarial probable cause determination must be made by a judge within 48 hours after the arrest. See Fla. R. Crim. P. 3.133(a)(1). The rules provide that the determination "may be based on sworn complaint, affidavit, deposition under oath, or, if necessary, on testimony under oath properly recorded." Fla. R. Crim. P. 3.133(a)(3). In actual practice the 48-hour judicial determination of probable cause is almost always made based on an affidavit or sworn complaint, which is sometimes called an "A-form" or "arrest form." It is usually filled out by the arresting officer after the warrantless arrest, which apparently is what happened in this case. The arresting officer need not be present when the judge decides whether the affidavit or complaint establishes probable cause to believe that the person arrested had committed a crime. Cf. Fla. R. Crim. P. 3.133(a)(3).

On the same day he arrested K.C.R., Deputy McKinney filled out a Rule 3.133(a)(3) complaint or affidavit. The parties call it "the arrest affidavit," and so

will we.  As the rules contemplate, McKinney set out in the arrest affidavit what he had learned and had been told that caused him to conclude there was probable cause to arrest K.C.R. for the crime of aggravated stalking.  The affidavit included short summaries of interviews McKinney had with four students who had attended the same middle school as K.C.R. and R.S.  Three of them told McKinney that K.C.R. had bullied R.S., while the fourth said that K.C.R. and R.S. had once been best friends but that K.C.R. ended their relationship.  From this and other facts McKinney concluded that R.S. had been "repeatedly and maliciously harassed by [K.C.R.]," and that "the malicious harassment of [R.S.], perpetrated by [K.C.R.], was a contributing factor in [R.S.'s] decision to commit suicide."  All of that is in the arrest affidavit.

K.C.R. was not required to attach the arrest affidavit as an exhibit to her complaint, but she did.  She also referred to it, or quoted from it, a dozen times in the complaint.  In that manner K.C.R. incorporated the affidavit into her complaint.  She could do so because she is the plaintiff, and "[t]he plaintiff is the master of the complaint."  See United States v. Jones, 125 F.3d 1418, 1428 (11th Cir. 1997).  But why would she do it?

The obvious reason K.C.R incorporated McKinney's affidavit into the complaint is to have a target at which to aim her arguments that he lacked probable cause, or even arguable probable cause, to arrest her for aggravated stalking.  She

8

was saying in effect:  "Here's his story, what he relied on when he made the arrest, and it isn't good enough."  See, e.g., Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss Am. Compl. at 4 ("The primary argument made by all Defendants is that the arrest affidavit executed by Defendant McKinney establishes probable cause thereby barring Plaintiff's claims.  Defendants are wrong."); id. at 5 ("At most, the facts in the arrest affidavit allude to a common middle-school-age rift.  No facts in the affidavit give rise to probable cause, or arguable probable cause, that Plaintiff maliciously harassed or cyberstalked the victim."); id. at 6 ("[T]he facts in the arrest affidavit in and of themselves are not sufficient to support a probable cause violation of [the Florida aggravated stalking statute]"); id. at 6 n.1 ("Notably, the affidavit fails to describe how the Defendants made the logical connection between any of Plaintiff's actions and the victim's emotional state/death.").

The district court accepted K.C.R.'s invitation to decide her arrest claim based on the facts set out in McKinney's arrest affidavit.  But after considering those facts, the court concluded that there was probable cause for the arrest.

Having lost with that strategy in the district court, K.C.R. is now trying a different one in this Court.  Instead of continuing to posit that the arrest affidavit shows what McKinney knew and didn't know when he arrested her, K.C.R. argues to us that the affidavit does not show that the facts set out in it were known to McKinney at the time of the arrest.  She says that "[t]he affidavit does not shed

9

light on when the details therein were made known to McKinney," and it "is not enough to show arguable probable cause or probable cause existed when McKinney effected the arrest." Appellant's Br. 45 n.29. Instead, the facts constituting probable cause or arguable probable cause must have been known to McKinney when he made the arrest. Anything he learned in the interval between the arrest and the creation of the affidavit doesn't count, and K.C.R. insists that there has been no showing that the facts in the arrest affidavit were known to McKinney at the time of the arrest instead of later.

We reject K.C.R.'s new theory because it comes too late. It was never raised in the district court, not even a little bit. Instead, in that court K.C.R. argued that the facts set out in the arrest affidavit, even if true, did not show probable cause or arguable probable cause. Period. She never argued that the facts alleged in the arrest affidavit were not known to McKinney at the time of the arrest. Not once. She may not switch theories and transform her position on appeal. See United States v. Stein, 889 F.3d 1200, 1202 (11th Cir. 2018) ("If we were to regularly address questions . . . that district[] court[s] never had a chance to examine, we would not only waste our resources, but also deviate from the essential nature, purpose, and competence of an appellate court.") (alterations in original) (quoting Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004)); Reaves v. Sec'y, Fla. Dep't of Corr., 872 F.3d 1137, 1149 (11th

10

Cir. 2017) ("To prevail on a particular theory of liability, a party must present that argument to the district court. Our adversarial system requires it; district courts cannot concoct or resurrect arguments neither made nor advanced by the parties.") (quoting Fils v. City of Aventura, 647 F.3d 1272, 1284 (11th Cir. 2011)); Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1352 (11th Cir. 2009) ("Because the issue or argument was not properly presented to the district court, we will not decide it."); Skinner v. City of Miami, 62 F.3d 344, 348 (11th Cir. 1995) ("[A]s a general rule, an appellate court will not consider a legal issue or theory raised for the first time on appeal . . . .").[3]

### B.  The Affidavit Versus The Allegations In The Complaint Itself

K.C.R. also argues that we should not credit McKinney's affidavit because she alleged in her complaint that the affidavit contains misleading, incomplete, and inaccurate information, and we must accept that it does because that's what her complaint says. Not exactly.

When it comes to accepting as accurate an exhibit attached to a complaint, we follow the same general pleading standards that apply under Federal Rule of Civil Procedure 8. "[M]ere conclusory statements[] do not suffice." Iqbal, 556

---

[3] For what it's worth, there does not appear to be much factual room for K.C.R.'s new theory anyway. The complaint states that K.C.R. was arrested "[o]n or about October 14, 2013." The arrest affidavit shows that is the same date McKinney signed the arrest affidavit before a notary public. K.C.R. did not allege in the complaint that the date on the affidavit is false. So the facts that McKinney put into the affidavit were known to him on the same day as the arrest.

U.S. at 678.  So when exhibits attached to a complaint "contradict the general and conclusory allegations of the pleading, the exhibits govern." Griffin Indus., Inc., 496 F.3d at 1206 (citing Associated Builders, Inc. v. Ala. Power Co., 505 F.2d 97, 100 (5th Cir. 1974) ("Conclusory allegations and unwarranted deductions of fact are not admitted as true, especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint.  If the appended document . . . reveals facts which foreclose recovery as a matter of law, dismissal is appropriate.")).  "The classic example is when a plaintiff attaches a document to his complaint but his allegations about what the document is or says contradict the document itself." Hoefling, 811 F.3d at 1277 (citing Simmons, 113 F.2d at 813).

In Simmons, "the classic example," the plaintiff alleged in his complaint that he and the defendant had entered into a contract, and he attached to the complaint several letters that he asserted either formed the contract or at least showed that an implied contract had been formed. See 113 F.2d at 812–13.  Because those letters did neither of those things, we affirmed the dismissal of the plaintiff's claims. Id. at 813.  We explained that the plaintiff could have survived a motion to dismiss if he had simply pleaded a short and plain statement alleging facts that a contract existed. Id.  But once he attached the letters to his complaint and alleged that they were the contract or at least showed that an implied contract existed, "it became the duty of the court . . . to construe th[e] letter[s] and determine [their] legal effect."

12

Id.  When the court did so, it appropriately found that the "letters not only did not show an express contract, but refuted the inference of an implied one."  Id.; cf. Crenshaw v. Lister, 556 F.3d 1283, 1292 (11th Cir. 2009) (accepting as true on summary judgment police officers' reports that plaintiff had attached to his complaint because the reports "refute[d] [the plaintiff's] conclusory and speculative allegation [in his complaint] about what the officers saw").  The rule is specific over speculative, concrete over conclusory.

When a complaint contains specific, well-pleaded allegations that either do not appear in the attached exhibit or that contradict conclusory statements in the exhibit, we credit the allegations in the complaint.  For example, in Saunders v. Duke, 766 F.3d 1262 (11th Cir. 2014), a plaintiff sued three police officers for excessive force and alleged that one of them had slammed the plaintiff's face onto the pavement when he was arrested.  Id. at 1265–66.  The plaintiff also alleged that the officers "failed to properly and correctly document the excessive force inflicted on him and the injuries he suffered" in their reports.  Id. at 1270.  The plaintiff went into great detail in his complaint about the force that was used against him and the injuries he received, while the officers' reports did not mention any use of force at all.  See Fifth Amended Complaint at 8–14, 18–23, Saunders v. Duke, No. 6:10-cv-120-CEM-GJK, 2012 WL 12870345 (M.D. Fla. Jan. 4, 2012), Doc. 50.

As a result, we did not credit the police reports even though the plaintiff had attached them to his complaint. See Saunders, 766 F.3d at 1270.

Here, the complaint contains some specific allegations about the statements in McKinney's affidavit and some conclusory ones. In his affidavit McKinney wrote down information that he had "gathered during []his investigation through interviews of [R.S.'s] fellow students." The complaint does not allege that McKinney made up the entire investigation, or that he never interviewed the students, as recounted in the affidavit, or that the students McKinney interviewed didn't tell him what he reported they did.

The complaint does allege that McKinney "maliciously, deliberately, and with a reckless disregard for the truth interviewed four minors and coerced, deliberately misconstrued, or falsified statements and used conclusory summaries," but that allegation in the complaint is too general and conclusory for us to know which specific statements in the affidavit allegedly are false or were coerced. We cannot throw out the entire arrest affidavit because K.C.R. made it part of her pleading. See Fed. R. Civ. P. 10(c). What we must do is compare each relevant allegation in the complaint with its counterpart in the arrest affidavit and decide if is specific enough to prevent that statement in the affidavit from being considered.

Some of the allegations in the complaint are specific enough to do that. For example, it specifically says that K.C.R. "never confessed to bullying the victim."

14

That is enough for us to disregard all of the statements about bullying that McKinney's affidavit says came from K.C.R.'s confession.  The complaint also specifically alleges that "McKinney maliciously, deliberately, and with a reckless disregard for the truth, falsely swore under oath that it was determined that malicious harassment was a contributing factor in the victim's decision to commit suicide."  That is specific enough for us to disregard McKinney's personal conclusion that K.C.R.'s harassment contributed to R.S.'s death.  (And, in any event, subjective views or conclusions of a defendant officer are irrelevant to the determination of probable cause.  See Rankin v. Evans, 133 F.3d 1425, 1433–34 (11th Cir. 1998)).

Other allegations in the complaint refer to particular statements in the arrest affidavit but are too general or conclusory for us to credit.  For example, in the affidavit McKinney stated that one of the students had said that K.C.R. had started a fight with R.S.  The complaint alleges that "the description of the fight was deliberately false and misleading," but it does not say what part of the description was false and misleading and in what way.

Other statements in the complaint that we do not credit include K.C.R.'s assertions that "[t]he Affidavit executed by Defendant McKinney does not establish probable cause" and "there are material misstatements and omissions in the Affidavit."  The first statement is a legal conclusion.  See Iqbal, 556 U.S. at

15

678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). The second statement is a general one so broad that it provides us no help in determining which statements in the affidavit are material misstatements or what has been omitted.

### C. The Factual Allegations Left Standing In The Complaint And The Arrest Affidavit

Reading the affidavit against the complaint and the complaint against the affidavit, here are the allegations we are left with for purposes of the motion to dismiss. K.C.R.'s twelve-year-old classmate, R.S., ended her young life by jumping off a silo at an abandoned cement plant in Lakeland, Florida on September 9, 2013. Deputy Sheriff McKinney of the Polk County Sheriff's Office headed up the investigation into R.S.'s death. On October 14, 2013, without a warrant, he arrested K.C.R. for felony aggravated stalking of a minor under 16 years of age. See Fla. Stat. § 784.048(5) ("A person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks a child under 16 years of age commits the offense of aggravated stalking, a felony of the third degree . . . ."); id. § 7804.048(6) ("A law enforcement officer may arrest, without a warrant, any person that he or she has probable cause to believe has violated this section."). The minor K.C.R. was charged with stalking was R.S.

16

After he arrested K.C.R., McKinney filled out an arrest affidavit that laid out the facts he asserted had given him probable cause to make the arrest. In that affidavit McKinney stated he had interviewed four of K.C.R.'s classmates. He learned from them that K.C.R. and R.S. had attended the same middle school and that they had been best friends at the beginning of the school year. According to two of the students, another student convinced or coerced K.C.R. to end that friendship. Three students also told McKinney that they had seen K.C.R. bullying R.S. by calling her names and intimidating her. One of them described that bullying as happening "constantly" during the second part of the school year; another said that K.C.R. had bullied R.S. on several occasions. And one student McKinney interviewed also stated that K.C.R. had started a fight with R.S. on February 4, 2013, and that the school had documented the fight. In her complaint K.C.R. does not dispute that this is what the students told McKinney, though she does allege that she actually did not bully R.S.

McKinney stated in his affidavit that based on the interviews he conducted he concluded that K.C.R. had "participated in and initiated a pattern of conduct between December 2012 and February 2013 with the purpose of maliciously harassing [R.S.]." It is undisputed that K.C.R. did not have contact with R.S. after February 2013 (about seven months before R.S.'s death) and that there was no evidence of text messages or postings on social media by K.C.R. about R.S.

17

D.  The Probable Cause Analysis

K.C.R. contends that the allegations in her amended complaint and the factual recitations in McKinney's affidavit, when viewed together, fail to establish probable cause that she violated Florida's aggravated stalking law.  Probable cause "exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."  Marx v. Gumbinner, 905 F.2d 1503, 1506 (11th Cir. 1990) (quotation marks and alterations omitted).  "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules."  District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018) (quotation marks omitted).  It "requires more than mere suspicion, but does not require convincing proof."  Bailey v. Bd. of Cty. Comm'rs, 956 F.2d 1112, 1120 (11th Cir. 1992); see Wesby, 138 S. Ct. at 586 ("It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.") (quotation marks omitted).  All in all, it's "not a high bar."  Wesby, 138 S. Ct. at 586.

McKinney arrested K.C.R. for an alleged violation of Florida Statutes § 784.048(5).  Again, that statute provides:  "A person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks a child under 16 years of age

18

commits the offence of aggravated stalking, a felony of the third degree . . . ." Fla. Stat. § 784.048(5). "Harass" is then defined as "engag[ing] in a course of conduct directed at a specific person which causes substantial emotional distress to that person and serves no legitimate purpose." Id. § 748.048(1)(a). Given this definition, K.C.R.'s harassment of her classmate need not have contributed to her death for K.C.R. to have violated the law. Instead, the statute requires only that the harassment cause "substantial emotional distress." Id.

Based on McKinney's investigation a reasonable person in his position would have concluded that K.C.R. willfully, maliciously, and repeatedly harassed her former friend and classmate. Students told McKinney that after K.C.R. had ended her friendship with R.S., she had bullied R.S. by calling her names and intimidating her. One student mentioned having seen K.C.R. bully R.S. on several occasions; another told him that K.C.R. was "constantly" bullying R.S. during the second part of the previous school year. And one of the students told McKinney that K.C.R. had started a fight with R.S., which the school had documented. From this, a reasonable person would conclude that K.C.R. harassed R.S. and caused her substantial emotional distress in violation of the Florida statute.

K.C.R. does allege in her complaint that McKinney "falsely swore under oath that it was determined that malicious harassment was a contributing factor in the victim's decision to commit suicide." But it matters not whether McKinney

himself (or anyone else at the Polk County Sheriff's Office) subjectively believed that K.C.R. had caused R.S.'s death.  She was not arrested on a charge of causing R.S.'s death.

It does not even matter whether McKinney personally believed that K.C.R. had stalked R.S.  Subjective beliefs "play no role in ordinary, probable-cause Fourth Amendment analysis."  Whren v. United States, 517 U.S. 806, 813 (1996); see Rankin, 133 F.3d at 1434 ("No subjective belief requirement exists under either [Florida] or federal law.").  Probable cause is an objective standard.  See Rankin, 133 F.3d at 1433.  The issue is not whether McKinney's subjective belief was reasonable, but whether "a reasonable man would have believed probable cause existed had he known all of the facts known by the officer."  Id. (quotation marks and alterations omitted).  Reasonable officers would have believed that probable cause existed to arrest K.C.R., even though the charge was eventually dismissed.  While causing "substantial emotional distress" is an element of aggravated stalking, causing or contributing to the victim's death is not.  Nor is the death of the victim.

### III.  THE TRIAL ISSUES

We now turn to K.C.R.'s contentions of error involving the district court's rulings at trial.  She challenges the court's refusal to grant her a new trial or to otherwise override the jury's verdict that McKinney had consent to enter her

20

house.  She stresses that none of the deputies, including McKinney, disputed that without consent they had entered into a screened-in porch that was in front of her house.[4]  These are trial-related issues and we draw from the evidence presented at trial to tell this part of the story, making all reasonable inferences in favor of McKinney as the prevailing party.  See Hubbard v. Bank Atlantic Bancorp., Inc., 688 F.3d 713, 724 (11th Cir. 2012).

### A.  Facts Related To The Consent To Enter Issue

In the early afternoon of October 14, 2013, McKinney called K.C.R.'s mother and asked her to bring her daughter down to the sheriff's department for questioning.  He did not tell her that he planned to arrest her daughter, though that was his plan.  K.C.R.'s mother refused the request.  Later that afternoon McKinney and three other sheriff's deputies — Sergeant Deborah Hamilton, Detective Christopher Lynn, and Lieutenant Jamie Rudd — headed to K.C.R.'s house to make the arrest.  McKinney testified at trial that he had time after his phone call with K.C.R.'s mother to obtain a warrant but that he and the other members of his team chose not to apply for one.  Instead, he said their plan was to go to the house and ask permission to enter, and if that didn't work they would post a deputy at the front door while they went and obtained a warrant.

---

[4] At trial that area was at different times called a "screened-in room," a "screened-in enclosure," and a "screened porch."  For consistency we will call the area a "porch" or a "screened-in porch" unless we are quoting the record.

21

The deputies arrived at the house in unmarked vehicles. They wore plain clothes, and bulletproof vests with "SHERIFF" emblazoned across the front, and their weapons were holstered. McKinney, followed by Lynn and Hamilton (Rudd would join later), approached the house, opened the door to a screened-in porch in front of the house, and walked through that area and up the three steps to the front door. Then McKinney knocked and announced in a loud voice: "Polk County Sheriff's Department." K.C.R.'s father answered the door. McKinney told him they were there to arrest K.C.R.

According to McKinney's and Hamilton's trial testimony, K.C.R.'s father told the deputies that he needed to put up his dog. He then shut the door. Rudd joined the other deputies while they were waiting for K.C.R.'s father to return. A few minutes later he opened the door and the deputies entered the house.

To determine whether McKinney had K.C.R.'s father's consent to cross that threshold, the jury heard from McKinney, Lynn, Rudd, Hamilton, and K.C.R.'s father. Because the jury's factual determination of this issue is the central issue on appeal, we will quote some of that testimony at length. First, from McKinney and Hamilton:

McKinney:

Q.    Okay. And you knocked and announced?
A.    Yes, sir, that's correct.
Q.    Then what happened?

22

A.  Then [K.C.R.'s father] opened the door.  I told [him] I was there to arrest [K.C.R.].  [K.C.R.'s father] asked if I could hang on for a minute while he put the dog up, he closed the door, he went back into the house for a few moments and then he came back to the door and opened the door.

Q.  Okay.  So he opened the door twice?

A.  That's correct.

Q.  Okay.  The first time he opened the door, you said you're here to arrest [K.C.R.]?

A.  That's correct. . . .

Q.  And what happened next?

A.  [K.C.R.'s father] opened the door wide and stepped back and I walked into the residence.

Q.  Okay.  Did he make any gesture?

A.  Not that I remember. . . .

Q.  So how did he move back?

A.  He opened the door and he stepped back.

Q.  Okay.  Did he say anything to you at that point?

A.  No, sir.

Q.  When he came b[ac]k to the door the second time, did he say anything when he opened it?

A.  I don't remember if he did or not.

Q.  Did you ever touch the door?

A.  I did not.

Q.  How wide did he open it?

A.  All the way open.

Q.  And where was he then standing?

A.  Beside the door.

Q.  Did you ever touch him?

A.  I did not.

Q.  Make any move toward him whatsoever?

A.  No, sir. . . .

Q.  Did anyone ever touch a weapon while there?

A.  Absolutely not.

Q.  Anybody make any threatening statements?

A.  No.

23

Hamilton:

A.    Detective McKinney told [K.C.R.'s father] that we were there to arrest [K.C.R.].
Q.    Okay.  And did [K.C.R.'s father] reply?
A.    Yes.
Q.    What did he say? . . .
[A.]  He said, just a moment, I need to put a dog away inside the house. . . .
Q.    Okay.  And then what did [he] do?
A.    He closed the door and went to put the dog away.
Q.    And what did y'all do, you and Detective McKinney and Detective Lynn do at that point?
A.    We waited outside for him to come back.
Q.    And what happened next?
A.    He came back, he opened up the door to the house and we went in.
Q.    How did he open up the door?
A.    He just opened it up and stood back.
Q.    Okay.  Was there plenty of room for you all to go in?
A.    Yes.
Q.    How did you proceed in at that point, in what manner?
A.    We just walked in, walked inside, into the living room.

Lynn and Rudd both testified that they could not hear any of the conversation between K.C.R.'s father and McKinney and that they followed the other deputies into the house on the assumption that K.C.R.'s father had welcomed them in.

K.C.R.'s father's testimony differed.  He said that he only heard the knock on the door, not the identifying announcement, and that he did not know who was there until he opened the door.  Once he did that, he told the jury, "[the deputies] said, 'we're here to arrest [K.C.R.]' and walked right in."  When asked whether the

24

deputies asked for consent to come in, or whether he "g[a]ve any indication that

[he] agreed with them to come in," he answered: "No."  But he did tell the jury

that none of the deputies bumped him or pushed him on their way in, even though

he had kept his hand on the door as they entered the house.  As he stated on cross-

examination:

> Q. Okay.  So you opened the door.  How did you open it?  How wide did you open it?
>
> A. I -- I opened it like this, I stood there and then they just kind of went in and I backed up.
>
> Q. Okay.  No one ever struck you --
>
> A No.
>
> Q. -- or bumped you or pushed you or anything?
>
> A. No.
>
> Q. Is it a single door?
>
> A. Yes, sir.
>
> Q. You, not unlike me, are a pretty big man, would you agree?
>
> A. Yeah.  I was a little bit lighter then though.
>
> Q. Okay.  Deputy McKinney is a fairly big man too?
>
> A. Yes.
>
> Q. Okay.  He was able to come through the doorway without bumping you or pushing you or doing anything?
>
> A. Yeah.  It was very close though.
>
> Q. Is that because you stood back?
>
> A. It was because, yeah, basically I stood back.  I mean, they had guns on them and stuff.  I wasn't going to get in front of them.
>
> Q. And you were holding onto the door at the time?
>
> A. Yes, sir, I still had it in my hand.
>
> Q. And opened it wide?
>
> A. I opened it semi-wide.
>
> Q. So there was room for you to stand there and them to all come in?
>
> A. Yeah, after the first one came in, I just -- what am I going to do?

25

Once the deputies entered the home, they found K.C.R. in her pajamas. Her mother pleaded with the officers: "Please don't take my baby, please don't take my baby!" The deputies let K.C.R. change into normal clothes, and then McKinney arrested her, walked her outside, and handcuffed her before putting her in the car and taking her to the Juvenile Assessment Center. She was held there for about six hours and released. All charges against her were eventually dismissed.

After the jurors heard all of this evidence, they retired to deliberate on a single question: "Did the Defendant Jonathan McKinney enter Plaintiff's house without consent in violation of Plaintiff's civil rights?" During their deliberations, the jurors sent the judge a question based on something one of the sheriff's deputies had said in his testimony. K.C.R.'s attorney had asked Deputy Rudd whether McKinney was already in the house when Rudd arrived, and Rudd answered that the other officers "were not in the house" but in "a screened-in room that was in the front of the home." The attorney didn't ask any follow-up questions about that, but the district court judge did.

In response to questions from the judge, Rudd explained that the screened-in porch was in front of the house and that the deputies had to enter that porch to get to the front door. The judge wondered: "If you're a law enforcement officer, what door do you knock on to gain entry into this residence?" Rudd responded that he wasn't sure what door the deputies had actually knocked on, but he "would have in

26

that scenario probably knocked on the screen door." The judge then attempted to clarify what the sheriff's department policy was for that kind of situation. In a rather confusing exchange, Rudd answered that "we would probably knock on the front door as well as the screened-in door at some point," and that "there would be an opportunity that you would have to knock on that front door [of the screened-in porch] to gain the attention of the homeowners themselves." Then he reiterated: "Whether [the other deputies] knocked on that screen door or not, I don't know."

None of the lawyers asked any questions about the screened-in porch, and, except for one very short exchange with another deputy during her testimony, the issue didn't come up again until the second day of jury deliberations. It was at that point the jury sent the judge a note asking: "By law, is the screened-in front porch considered a part of the house?" The parties debated how the judge should answer that question. The district court, over K.C.R.'s objection, answered it this way: "For purposes of this case, no." K.C.R. moved for a mistrial, which the district court denied. The jury then rendered a verdict for McKinney, finding that he had consent to enter K.C.R.'s home. The court denied K.C.R.'s motion for judgment as a matter of law and her motion for a new trial.

27

### B.  Issues Related To Consent

K.C.R. contends that the district court should have granted her a new trial or judgment as a matter of law because there was insufficient evidence for the jury to find that McKinney had consent to enter her home.

### 1.  Motion for New Trial

Rule 59 of the Federal Rules of Civil Procedure allows a district court to order a new trial based on insufficient evidence, but "only if the verdict is against the clear weight of the evidence or will result in a miscarriage of justice." Chmielewski v. City of St. Pete Beach, 890 F.3d 942, 948 (11th Cir. 2018) (quotation marks omitted).  "Because it is critical that a judge does not merely substitute his judgment for that of the jury, new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great — not merely the greater — weight of the evidence."  Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001) (quotation marks omitted). We review the denial of a motion for a new trial only for an abuse of discretion, and "[d]eference is particularly appropriate where," as here, "a new trial is denied and the jury's verdict is left undisturbed."  Walter Int'l Prods., Inc. v. Salinas, 650 F.3d 1402, 1407 (11th Cir. 2011) (quotation marks omitted).

The Fourth Amendment provides that "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be

28

violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. Because "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," it is "a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 585–86 (1980) (quotation marks omitted). That also means that law enforcement officers are prohibited "from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." Id. at 576. But if a warrantless search is authorized by voluntary consent, the search is "wholly valid." Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).

Because McKinney did not have a warrant to enter K.C.R.'s home, the sole question for the jury was whether he had consent to enter the house. Whether "consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Id. at 227. While we have explained that this determination is "not susceptible to neat talismanic definitions," United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989), we have identified some factors that are relevant for the factfinder to consider, see United States v. Chemaly, 741 F.2d

29

1346, 1352 (11th Cir. 1984). Those factors include: (1) the voluntariness of the person's custodial status, (2) "the presence of coercive police procedure," (3) the extent of the person's cooperation with law enforcement, (4) whether the person knew that he could refuse consent, and (5) the person's "education and intelligence." Id. (quotation marks omitted); see also Schneckloth, 412 U.S. at 249 (explaining that "while the subject's knowledge of a right to refuse is a factor to be taken into account," it is not a "prerequisite to establishing a voluntary consent").

K.C.R.'s argument hinges on the second factor: coercive procedures, conduct, or words. "Where there is coercion there cannot be consent." Bumper v. North Carolina, 391 U.S. 543, 550 (1968); see Florida v. Bostick, 501 U.S. 429, 438 (1991) ("'Consent' that is the product of official intimidation or harassment is not consent at all."). K.C.R. argues that she is due a new trial because McKinney failed to meet his burden of showing that he had voluntary consent to enter the house, and that he failed to do so because the evidence showed that K.C.R.'s father was coerced into letting the sheriff's deputies into his home. Before exploring that fact-bound question, we address who has the burden of proving what.

### a. *The Parties' Burdens at Trial*

Often when we are tasked with reviewing a determination of consent, it is because a defendant has challenged the validity of her conviction or is seeking to suppress certain evidence based on an unlawful search. See, e.g., Blake, 888 F.2d

30

at 797–98 (considering whether evidence should be suppressed on the ground that a search exceeded the scope of the defendants' consent); United States v. Edmondson, 791 F.2d 1512, 1515 (11th Cir. 1986) (finding that the defendant's warrantless arrest in his home was illegal because his "consent" was based on a show of official authority by police officers).  We have explained that because "[a] warrantless, nonconsensual entry into a suspect's home to make a routine felony arrest is presumed to be unreasonable," Edmondson, 791 F.2d at 1514, the burden is on the government to rebut that presumption and prove that the consent was voluntary, Chemaly, 741 F.2d at 1352; see also United States v. Matlock, 415 U.S. 164, 177 (1974) (stating that in the case before it the government "sustained its burden of proving by the preponderance of the evidence that [a third-party's] voluntary consent to search . . . was legally sufficient" to overcome the defendant's motion to suppress); Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971) ("[T]he burden is on those seeking the exemption to show the need for it.").  That's all true in criminal cases.

It's not in civil cases.  "[I]n a § 1983 action, the plaintiff bears the burden of persuasion on every element."  Cuesta v. Sch. Bd. of Miami-Dade Cty., 285 F.3d 962, 970 (11th Cir. 2002).  That burden is on the plaintiff even where the government would be bear it in criminal case.  See id. (stating that it was the plaintiff's "burden to show that the County lacked reasonable suspicion to search

31

her" and holding that her claims failed as a matter of law because she "failed to produce any evidence indicating that the [jail] personnel lacked reasonable suspicion that she was concealing weapons or contraband"); Rankin, 133 F.3d at 1436 ("[P]laintiffs had the burden of demonstrating the absence of probable cause in order to succeed in their § 1983 claim."); Evans v. Hightower, 117 F.3d 1318, 1320 (11th Cir. 1997) ("In order to establish a Fourth Amendment violation, [the plaintiff] must demonstrate that a seizure occurred and that it was unreasonable."). "There is no question, therefore, that [K.C.R.] ultimately b[ore] the burden of persuasion in this case." Am. Fed'n of State, Cty. & Mun. Emps. Council 79 v. Scott, 717 F.3d 851, 880 (11th Cir. 2013).

Once a plaintiff shows that an arrest occurred in her home and that it was conducted without a warrant, it is the burden of production that shifts to the government to present evidence justifying the arrest. See Fed. R. Evid. 301 ("The party against whom a presumption is directed has the burden of producing evidence to rebut the presumption.").

> Thus, for example, when a plaintiff asserts that the police conducted an unconstitutional warrantless search, and the government claims that its search was legal under an exception to the warrant requirement, . . . the plaintiff meets its initial burden by demonstrating the absence of a search warrant. At that point, it is the government that bears the burden of coming forward with evidence that an exception to the warrant requirement applied.

Am. Fed'n, 717 F.3d at 881–82.

32

That shift of the burden of production, however, "does not shift the burden of persuasion, which remains on the party who had it originally." Fed. R. Evid. 301. So here, once K.C.R. showed that there was a warrantless arrest that was presumptively unreasonable (which she did), and once McKinney came forward with some evidence that the consent exception applied (which he did), it became K.C.R's burden once more "to show either that [her father] never consented or that the consent was invalid because it was given under duress or coercion." Valance v. Wisel, 110 F.3d 1269, 1279 (7th Cir. 1997). In other words, it was her burden, not McKinney's, to persuade the jury on the one question before it.[5]

### b. *Evidence That McKinney Had Consent to Enter*

K.C.R. contends that the jury's verdict against her is against the great weight of the evidence. Her argument goes like this. First: Because there was no evidence that her father verbally consented to McKinney's entry, the "sole basis" for consent "rest[ed] on the premise that after being informed that McKinney was there to arrest KCR, [her father] allegedly closed the door to go 'put the dog up' and then returned to the door, opened it[,] and stepped back." Appellant's Br. 22–23 (footnotes omitted). Second: That premise for showing consent ignores what

---

[5] Although Valance and American Federation involved warrantless searches instead of warrantless arrests, the same burden-shifting framework applies here. Warrantless arrests in the home, like warrantless searches, are presumptively unreasonable. See Edmondson, 791 F.2d at 1514.

33

else had happened that day. McKinney had called just hours before to ask K.C.R.'s mother to bring her down to the station for questioning, but she had refused to do that. K.C.R. says that when armed deputies wearing bullet-proof vests appeared at her home thereafter, McKinney's announcement that he was "there to arrest [K.C.R.]" became a "command" to let the deputies into the house. Id. at 24 & n.15, 27–28. Therefore, she reasons: "[T]he only reasonable interpretation of the testimony at trial was that [K.C.R.'s father] acquiesced to the show of authority demanding [that he] produce his daughter for arrest." Id. at 24.

Of course, "[t]he fact that a person answers a knock at the door doesn't mean he agrees to let the person who knocked enter." McClish v. Nugent, 483 F.3d 1231, 1247 (11th Cir. 2007) (quotation marks omitted). Consent is not always to be inferred from the absence of an objection, although it is a factor to consider. See United States v. Gonzalez, 71 F.3d 819, 829–30 (11th Cir. 1996) ("[W]e believe, as a matter of law, it cannot be said that failure to object to a search equals consent to the search.") (quotation marks and alterations omitted), abrogated on other grounds by Arizona v. Gant, 556 U.S. 332 (2009). A factfinder must "analyz[e] all the circumstances" of an individual's action to determine whether in fact there was consent and "whether in fact it was voluntary or coerced." Schneckloth, 412 U.S. at 233; see id. at 228 ("[T]he Fourth and Fourteenth

34

Amendments require that a consent not be coerced, by explicit or implicated means, by implied threat or covert force.").

K.C.R. is right that one way consent is coerced is if it's granted "only in submission to a claim of lawful authority." Id. at 233.  For example, "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search," leaving no way to consent to it.  Bumper, 391 U.S. at 549.  A choice in which the answer is dictated by coercion is no choice at all.  "For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." Schneckloth, 412 U.S. at 228; see Moore v. Pederson, 806 F.3d 1036, 1046 (11th Cir. 2015) (holding there was no consent to enter house where officer told plaintiff he was going to arrest him and plaintiff, who was inside the doorway of his house, simply put his arms behind his back); United States v. Tovar-Rico, 61 F.3d 1529, 1535–36 (11th Cir. 1995) (holding there was no consent where five police officers knocked on defendant's door, announced their identity, and asked for permission to enter — and then rushed into the home with guns drawn as soon as defendant opened the door); Edmondson, 791 F.2d at 1514–15 (no consent to search home where officers with guns drawn knocked on door, announced "FBI.  Open the door," and defendant opened the door and put his hands on his head).

35

And courts must not "misinterpret acquiescence to an officer's demands as consent." United States v. Berry, 670 F.2d 583, 596 (5th Cir. Unit B 1982) (en banc). We have "noted our hesitancy to find implied consent (i.e., consent by silence) in the Fourth Amendment context." Gonzalez, 71 F.3d at 823, 830 (no consent where marshal followed defendant's mother into her house when she told them she was going inside for a drink of water); see Bates v. Harvey, 518 F.3d 1233, 1244 (11th Cir. 2008) (no consent based on housemate's "failure to object to the officers' search"); Bashir v. Rockdale County, 445 F.3d 1323, 1328–29 (11th Cir. 2006) (no consent where officer followed plaintiff inside his house uninvited).

This case is not like those. The jury heard evidence that the deputies made no show of authority to coerce K.C.R.'s father into consenting to their entry. All of the deputies testified that they did not have their guns drawn. All of them testified that they didn't use or threaten to use any kind of force. And there is no evidence that any of them claimed to have a warrant. That distinguishes the present case from those in which we have held that the law enforcement officers' claim of authority coerced the occupant into letting them in. Cf. Moore, 806 F.3d at 1046; Tovar-Rico, 61 F.3d at 1535–36; Edmondson, 791 F.2d at 1514–15.

This case is more like United States v. Ramirez-Chilel, 289 F.3d 744 (11th Cir. 2002), and Holmes v. Kucynda, 321 F.3d 1069 (11th Cir. 2003). In Ramirez-Chilel, four police officers approached the defendant's residence shortly before

36

midnight, knocked on the door and identified themselves, and then asked for permission to search the house for evidence of counterfeit documents. 289 F.3d at 746–47. According to the testimony of one of the officers, the defendant "yielded the right-of-way" to allow them in. Id. at 747 (brackets omitted). The officers found evidence of a counterfeiting operation, and the defendant moved to suppress those fruits of the search based on lack of consent. Id. at 747–48. We affirmed the district court's denial of the motion to suppress, explaining that there is "a distinction between the failure to object when officers follow someone into their home and the act of 'yielding the right-of-way' to officers at the person's front door." Id. at 752. We added: "Although the officers did not receive any explicit verbal consent from [the defendant] to enter, the officers did receive some sort of implied consent to enter from [his] body language . . . ." Id.

Similarly, the law enforcement officers in Holmes responded to a domestic disturbance and knocked on the suspect's apartment door. 321 F.3d at 1073–74. A man answered the door and the officers asked if they could enter the apartment. Id. at 1074. According to the officers' testimony, "although [the man] did not respond verbally, he opened the door and took a step backwards, indicating acquiescence." Id. We concluded that was sufficient evidence of consent to reject the argument of the man's girlfriend in her § 1983 suit that the warrantless entry had violated her constitutional rights. Id. at 1078–79.

37

Ramirez-Chilel and Holmes show that consent need not be verbal to be valid. Non-verbal cues can signal consent. And here, the evidence at trial showed that the combination of both verbal and non-verbal cues was sufficient for a jury to find that K.C.R.'s father consented to the officers entering his home.

For instance, McKinney testified that when K.C.R.'s father answered the door, McKinney told him he was there to arrest K.C.R. K.C.R's father responded by asking if McKinney "could hang on for a minute while he put the dog up," and then he returned a few minutes later and "opened the door wide and stepped back." It was only at that point that McKinney entered the house. Hamilton told the jury a similar story, stating that when K.C.R.'s father "opened [the door] up and stood back," there was plenty of room for the deputies to go in. Given the totality of the circumstances, a jury could reasonably find that K.C.R.'s father consented to the deputies' entry.

K.C.R. seeks to distinguish Ramirez-Chilel and Holmes by pointing out that in those cases the officers had explicitly asked to enter the home, which made it clear that the occupants were allowing the officers in when they opened the door and stood back. Cf. Holmes, 321 F.3d at 1078–79; Ramirez-Chilel, 289 F.3d at 746–47. By contrast, she says, McKinney and the other deputies did not ask to enter the home and simply "commanded" entry by announcing that they were there to arrest K.C.R.

38

We are not convinced that this distinction makes a difference. While K.C.R. argues that McKinney's announcement was a coercive show of authority, the jury was free to conclude that it was instead an informative statement to explain to K.C.R.'s father why the deputies were there. And it was also free to conclude that, by opening the door and stepping back, K.C.R.'s father was giving the deputies his consent to enter his home.

It is not our task to answer the question of consent in the first instance. That task fell to the jury. Lipphart, 267 F.3d at 1186 ("[I]t is critical that a judge does not merely substitute his judgment for that of the jury . . . ."). Our only task is to determine whether the district court abused its discretion when it concluded that the jury's verdict was not against the great weight of the evidence and did not result in a miscarriage of justice. See id.; Walter Int'l Prods., 650 F.3d at 1407. It did not.

### 2. Motion for Judgment as a Matter of Law

Turning now to the district court's denial of K.C.R.'s Rule 50 motion for judgment as a matter of law on the consent to enter issue, our review is de novo. Skye v. Maersk Line, Ltd. Corp., 751 F.3d 1262, 1265 (11th Cir. 2014). But "[s]uch a motion is to be granted only if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." Chmielewski, 890 F.3d at 948 (quotation marks omitted). For the same

39

reasons we just explained, a reasonable jury could conclude that K.C.R.'s father

consented to McKinney's entry into the house.  See Fed. R. Civ. P. 50(a)(1);

Chmielewski, 890 F.3d at 948.[6]

## C.  The Screened-In Porch

That leaves K.C.R.'s final contention, which is that the district court made

two errors involving the screened-in porch that entitle her to a new trial or to

judgment as a matter of law.  First, she argues that the jury's verdict went against

the great weight of the evidence because there was insufficient evidence for the

jury to conclude that McKinney had permission to enter the screened-in porch,

regardless of whether he later had permission to enter the house proper.  And

second, she argues that the court prejudiced her right to a fair trial by answering

the jury's question about that porch ("By law, is the screened-in front porch

considered part of the house?") with what she describes as a factual determination

("For purposes of this case, no.").

---

[6] K.C.R. also challenges the grant of summary judgment against her on her official capacity claim against Sheriff Judd alleging that his office had a policy sanctioning warrantless arrests in homes.  "If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized [a constitutionally suspect act] is quite beside the point."  City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986). Because K.C.R.'s claim against McKinney fails, her policy claim against the sheriff in his official capacity necessarily fails.

40

We review only for an abuse of discretion the denial of K.C.R.'s motions for a new trial and a mistrial.  See United States v. Osmakac, 868 F.3d 937, 957 (11th Cir. 2017).

1.  Motion for New Trial Based on Insufficient Evidence

According to K.C.R., McKinney violated her constitutional rights by opening the door to the screened-in porch and walking through it to knock on the front door of the house.  The way she sees it, that porch is considered curtilage, which means that McKinney needed a warrant or an exception to the warrant requirement to enter it.  And, she argues, the district court should have granted her a new trial because "there was not even a scintilla of evidence which rebutted the presumption that McKinney's conduct violated the Fourth Amendment."

There's a simple reason K.C.R. can't find a "scintilla of evidence" in the record about whether the screened-in porch constituted part of the house and whether McKinney could walk through it.  She didn't raise the issue.  It's not in her complaint, it's not in any of her pre-trial motions, and it's not in her proposed jury instructions.[7]  And as the district court found in denying her motion for a new

---

[7] There is no mention of the "screened-in" porch or of the word "curtilage" in the amended complaint or in any of the pre-trial motions.  In her response to McKinney's motion for summary judgment, K.C.R. did not mention that McKinney and the other officers had to go through the screened-in porch to get to the front door.  Instead, she started her story about the warrantless entry with the deputies already at the front door:  "The deputies knocked hard on the door to KCR's home at nighttime."  Her description of the case in the parties' Joint Pretrial Statement also left out any mention of the screened-in porch.

41

trial, K.C.R. didn't raise the issue in any way at any point anywhere in the case before the jury returned its verdict.

The first mention of the screened-in porch was during Lieutenant Rudd's testimony. K.C.R. asked Rudd whether McKinney was already in the house when he arrived on the scene, and Rudd answered that the other deputies "were not in the house," but instead were in "a screened-in room that was in the front of the home." K.C.R. continued her questioning without asking any more questions about the screened-in porch. After K.C.R. was done, the court asked Rudd some questions, including whether the deputies knocked or should have knocked on the screen door before they entered the porch and proceeded to the main door of the house. Rudd responded that he "believe[d] that there would be an opportunity that you would have to knock on that front door [of the screened-in porch] to gain the attention of the homeowners," but he wasn't sure whether the other deputies had done that.

The next time the issue surfaced was during the testimony of Hamilton. During her cross-examination of Hamilton, K.C.R. asked whether Hamilton had opened the screen door. Hamilton said that McKinney had opened it. K.C.R. then asked whether McKinney had authorization to go "into their porch, screened porch area." McKinney objected to the question on relevance grounds, the district court sustained the objection without any argument from K.C.R., and K.C.R. moved on to a different line of questioning.

42

The issue did not come up again until the jury sent its note asking whether "[b]y law" the screened-in porch was considered part of the house.  (More about that later.)  But even after the jury asked that, it was not until  K.C.R.'s post-verdict motions for a new trial and judgment as a matter of law that she argued the screened-in porch was relevant to the case.  Of course, that was too late for her Rule 50 motion.  Federal Rule of Civil Procedure 50(b) talks of "renewing" an earlier Rule 50(a) motion for judgment as a matter of law, meaning that "a district court can grant a Rule 50(b) motion only on grounds advanced in the pre-verdict Rule 50(a) motion."  McGinnis v. Am. Home Mortg. Servicing, Inc., 817 F.3d 1241, 1260 (11th Cir. 2016) (quotation marks and alterations omitted).  Because K.C.R. did not make her curtilage argument in her pre-verdict motion, she could not make it in her post-verdict motion.

K.C.R. does not take issue with that.  Instead she points out that her motion for a new trial, unlike her motion for judgment as a matter of law, did not require a pre-verdict counterpart.  True enough.  See Urti v. Transp. Commercial Corp., 479 F.2d 766, 769 (5th Cir. 1973) ("We have previously held that motions [for judgment as a matter of law] are not prerequisites to a motion for a new trial.").  But that does not mean a plaintiff can proceed on one theory of the case throughout the trial and then be entitled to a do-over under a different theory.  See Del Rio Distrib. Inc. v. Adolph Coors Co., 589 F.2d 176, 178–79 (5th Cir. 1979).  As the

43

party alleging that her constitutional rights were violated, it was K.C.R.'s burden to "demonstrate that a seizure occurred and that it was unreasonable." Evans, 117 F.3d at 1320 (emphasis added).

K.C.R. objects to that characterization, relying on Federal Rule of Civil Procedure 15(b)(2) for cover. It provides: "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2). K.C.R. says that's what happened here because the deputies' testimony about the screened-in porch "must have been sufficient to raise the issue by implication since the jury itself took note of the evidence enough to ask the District Court questions about its relevance during deliberations."

But here again, a look at the record shows that K.C.R. rejected whatever lifeline the jury's question might have thrown her way (and we don't think it was a stout line to begin with). Upon receiving the jury's note, the court told the attorneys that it was going to inform the jury that the screened-in porch was not part of the house. K.C.R.'s attorney objected — but only because he did not consider the issue to be relevant to the claim. Here's the exchange:

> THE COURT: All right. There's been no allegation in the case or argument in the course of the trial that opening of the screen door was in any way a violation of the plaintiff's rights, so I'm going to tell the jury "no" as relates to the question about is the screen door part of the house, because even if it is, there's been no argument, and there is specific case law to establish whether a porch is or isn't subject to

44

Fourth Amendment protection, but it requires some evidence as to the content of the porch, the use of the porch, the appearance of the porch, none of which has been introduced into evidence in this case. So if it was your intention to raise something about the porch, then it has failed for lack of evidence.

[K.C.R.'s attorney]: Let me -- for the record, Your Honor, we asked them questions, it was a screened-in porch, and they went through a screen door, and, you know, for the record, we didn't allege in the Complaint the front door, we alleged they didn't have consent to enter the premises or the house, period, whether it was screen door, back door or side door. . . .

I'd also request that [the jurors] be brought in and asked if they did any research last night, if anybody got on the computer, because you gave them explicit jury instructions on what the single issue of this case is, and we're getting questions unrelated to what the jury instructions are. . . .

I just think it's irrelevant to their determination here ultimately, but -- I think you're telling them something that, you know, hasn't been briefed and, you know, I'm pretty sure a screened porch with a door on it is -- in an enclosed area is part of the house.

THE COURT: And you are pretty sure to be wrong about that unless there's certain clear indicia that this is part of the living space of the house, and there's been no evidence of it, so for purposes --

[K.C.R.'s attorney]: I understand that, Your Honor, so you can't say yes or no, it's just irrelevant to the issue of this case. . . . [T]he issue relating to consent to enter and go into the home to arrest is unrelated to the screen door, unrelated to the front door really, either they could come in or they couldn't come in, and they did, and so it's just not something for them to consider, not that it's no.

THE COURT: So what do you want me to say?

[K.C.R.'s attorney]: That it's not relevant to the issues in this case and follow the jury instructions.

45

(Emphasis added.)

In short, through her attorney K.C.R. told the court that the question of whether the screened-in porch was part of the house was "irrelevant" — that the answer to the question had no bearing on the jury's determination of whether McKinney had consent to enter the house.  K.C.R. cannot now argue that it was reversible error for the court to take her attorney at his word.  See United States v. Carpenter, 803 F.3d 1224, 1236 (11th Cir. 2015) ("It is by now a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party.") (quotation marks omitted); United States v. Dennis, 786 F.2d 1029, 1042 (11th Cir. 1986) ("To preserve an issue at trial for later consideration by an appellate court, one must raise an objection that is sufficient to apprise the trial court and the opposing party of the particular grounds upon which appellate relief will later be sought.  A general objection or an objection on other grounds will not suffice.").  The district court did not abuse its discretion by denying K.C.R.'s motion for a new trial based on her belated curtilage argument, which was not presented to the jury.

### 2.  Motion for a New Trial Based on the District Court's Response to the Jury's Question

K.C.R. also argues that she is entitled to a new trial because of the district court's response to the jury's question about the screened-in porch.  We will reverse a district court's supplemental instructions only "when we are left with a

46

substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." United States v. Grigsby, 111 F.3d 806, 814 (11th Cir. 1997) (quotation marks omitted); see United States v. Lopez, 590 F.3d 1238, 1247–48 (11th Cir. 2009) ("While the district court has considerable discretion regarding the extent and character of supplemental jury instructions, it does not have discretion to misstate the law or confuse the jury.").

When the jury asked whether, "[b]y law[,] is the screened-in front porch considered a part of the house?" the judge answered:  "For purposes of this case, no."  K.C.R. says that answer was not only legally wrong but also instructed the jury how to answer the fact question of whether McKinney had consent to enter the house.  Appellant's Br. 41.  According to her, the court's response "indicated to the Jury that McKinney's actions in approaching the door were lawful, and suggested that any consent he thereafter obtained would likewise be lawful." Id. at 43.

We disagree.  K.C.R.'s attorney objected to the exact wording of the answer. But the alternative answer he proposed conveyed the same sentiment as the one the court gave.  When the court asked, "So what do you want me to say" to the jury about whether the porch was part of the house, the attorney stated:  "That it's not relevant to the issues in this case and follow the jury instructions."  That is essentially what the court told the jury.  And K.C.R.'s attorney had made the porch irrelevant, by leaving it out of the case and by insisting that it was irrelevant to the

47

only issue before the jury.  K.C.R. cannot now argue that the porch issue was not only relevant but was so much so that we should reverse the district court's judgment.

**AFFIRMED.**