[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-11244

Non-Argument Calendar

_____

SHAHRIAR ANOUSHFAR,

Plaintiff-Appellant,

*versus*

LEXINGTON INSURANCE COMPANY,

Defendant- Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 2:20-cv-00658-SPC-NPM

_____

Before JORDAN, NEWSOM, and LAGOA, Circuit Judges.

PER CURIAM:

Shahriar Anoushfar appeals the district court's order dismissing his amended complaint under Federal Rule of Civil Procedure 12(b)(6) for failing to state plausible claims for which relief could be granted. For the reasons stated below, we affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Anoushfar owned a house in Punta Gorda, Florida (the "Property") that he rented to a third party. Anoushfar purchased an insurance policy (the "Policy") from Lexington Insurance Company to insure the Property for a one-year period, effective July 19, 2017. The Policy affords Anoushfar various coverages, including "Coverage A: Dwelling"—which covers the dwelling on the Property (and structures attached thereto), as well as material and supplies located on or next to the Property used to construct, alter, or repair the dwelling or other structures on the Property—with a stated limit of liability of $1,490,893.00.

According to the amended complaint, on September 10, 2017, Hurricane Irma caused extensive windstorm damage to the Property, "including, without limitation, physical losses to the [Property's] interior finish, roofing, exterior cladding, and window systems/components" (the "Loss"). As a result, the Property became immediately uninhabitable, and Anoushfar's tenant resid-

ing in the Property vacated the premises due to the deplorable living conditions.

Following Hurricane Irma, Anoushfar properly notified Lexington of the Loss, tendering the resulting insurance claim (the "Claim") to Lexington.  Lexington acknowledged receipt of the Claim and retained the services of a third-party adjusting company to inspect and estimate the cost to repair the covered damage to the Property related to the Claim.  Following the third-party inspection, Lexington adjusted the Loss and estimated that Hurricane Irma had caused $5,452.00 in covered damage.  On November 26, 2017, a claim representative for Lexington issued a letter to Anoushfar advising him that his Claim "ha[d] been closed without payment" as the document at the Property "did not exceed the windstorm deductible."

During the timeframe leading up to Lexington's initial adjustment, Anoushfar retained a professional insurance consultant and engineering firm to prepare engineering and estimating assessments.  These assessments estimated the replacement cost value ("RCV") of the Loss to be $576,905.26.  Anoushfar provided this RCV estimate, as well as his signed and notarized statement of proof of loss (the "POL package") to Lexington for its evaluation and consideration.  Lexington did not provide a timely response to the POL package; instead, its claim representative rejected the POL package, stating that Lexington did not accept that amount of loss.

Based on Lexington's denial of payment, the parties' "clear and unequivocal disagreement over the amount of the Loss," and Lexington's ongoing failure to further adjust the Claim upon receiving the POL package, Anoushfar demanded binding appraisal proceedings in accordance with the Policy's Appraisal clause. The Policy's Appraisal clause provides, in relevant part:

> If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss. . . .

Additionally, on May 4, 2018, Anoushfar filed a Civil Remedy Notice of Insurer Violations ("CRN"). After receiving the CRN, Lexington agreed to appraisal. While the claim was pending and appraisal was ongoing, Anoushfar could no longer make mortgage payments on the Property and sold it in "as is" condition on September 26, 2018, at a great financial loss.

On October 16, 2018, the appraisal panel concluded its deliberations and issued an appraisal award—signed by Anoushfar's appraiser and the umpire—for the damage to the Property at $547,455.95 for its replacement cost and $504,173.54 for its actual cash value.  In other words, the amount of the Loss was valued, at most, almost $30,000 less than the $576,905.26 that Anoushfar's professional insurance consultant and engineering firm estimated the RCV of the Loss to be prior to the appraisal.  Additionally, in the appraisal award form, three categories—"Ordinance & Law," "Personal Property," and "Loss of Use/ALE"—were labeled "TO BE DETERMINED."  Six days after the award was issued, Lexington paid Anoushfar $420,614.94—the replacement cost minus depreciation and the Policy's deductible of $74,544.65.

Following the issuance of the appraisal award, Anoushfar, believing that the appraisal award was more than half of the Property's tax value, hired an engineer to opine on whether the Loss as to the Property was a "total loss" under the Policy. Anoushfar, however, did not raise the question of whether the damage to the Property constituted a "total loss" during the appraisal process.  Anoushfar's engineer determined that, under the facts and circumstances, the Property had suffered a "total loss." Based on his reading of the Policy, Anoushfar requested Lexington to pay the remaining balance of the Policy's Coverage A for the total loss or, alternatively, to submit to appraisal on the question of whether the Loss was a "total loss."  Lexington, however,

refused to pay any additional amount and also rejected his request for another appraisal on the total loss question.

On July 10, 2020, Anoushfar filed a complaint against Lexington in Florida court. Lexington removed the action to federal district court on the basis of diversity.

Subsequently, Anoushfar filed his amended (and the operative) complaint on October 6, 2020. In his amended complaint, Anoushfar raised four claims. In Count I, Anoushfar sought specific performance in the form of an order compelling Lexington to engage in appraisal proceedings on the total loss question. In Count II, he sought a declaratory judgment as to the parties' rights, duties, and responsibilities under the Policy with respect to the Loss and the question of whether it constituted a total loss under the Policy, as there was "an ongoing and justiciable dispute" between him and Lexington "with respect to the type/extent of coverages, coverage benefits, and/or contractual remedies due to [him] under the Policy's terms and provisions in light of the particular facts and circumstances of the Loss" and the question of whether there was a total loss. In Count III, he claimed that Lexington breached its contract with him by failing to agree to an appraisal panel's consideration of the total loss question or by failing to pay him the Policy's limits after his engineer determined that the Loss constituted a total loss under the Policy. And, in Count IV, Anoushfar alleged that Lexington's post-Loss, pre-appraisal conduct constituted bad faith in violation of Florida law.

Lexington moved to dismiss the amended complaint for failure to state a plausible claim under Rule 12(b)(6), primarily arguing that the appraisal process resolved all the issues between the parties as to the Loss and that Florida law does not allow a party to compel a second appraisal of a claim absent allegations of fraud or other limited instances. Lexington further argued that the bad faith claim in Count IV was premature. The district court then held a hearing on Lexington's motion.

Then, on March 16, 2021, the district court granted Lexington's motion to dismiss. The district court first noted that there was no dispute that the parties had fully litigated the Loss before the appraisal panel, which agreed with Anoushfar that the loss exceed $500,000. The district court explained that Anoushfar's theory that he did not realize until the appraisal award that the damage was so extensive to the Property that it might constitute a total loss under the Policy was not plausible, given his own independent appraisal of the damage before the appraisal process began estimated the Loss to be $30,000 higher than the appraisal panel awarded. The court found that once "his initial damage estimate found a loss of nearly $600,000, Anoushfar should have realized that the damage constituted more than half of the taxable value of the property" and that because he failed to present the total loss issue to the appraisal panel, he could not receive "another bite at the apple."

The district court then turned to Anoushfar's argument that the Policy was ambiguous because it did not specifically pro-

vide for a single appraisal and because the appraisal award provided that other items were "to be determined." The court explained that there were few decisions on point, but relied on *Noa v. Florida Insurance Guarantee Association*, 215 So. 3d 141 (Fla. Dist. Ct. App. 2017), in which the Florida appellate court declined to order a new appraisal of an insured's new claim based on a policy's "ordinance and law" coverage because the original appraisal award necessarily included the panel's expert judgment as to whether any ordinance or law required more extensive repairs. The district court determined that, similar to *Noa*, "whether the damage to Anoushfar's property constituted a total loss . . . was within the appraisal panel's expertise and should have been baked into their computations." The court noted that if Anoushfar believed he submitted additional losses under the Policy, and Lexington denied coverage for those losses, he could perhaps litigate that issue. But the district court explained that his claim was Lexington breached the Policy by failing to agree to a second appraisal and that the Policy did not support this claim. And because "[m]ost of Anoushfar's declaratory-judgment and specific-performance claims depend[ed] on his breach-of-contract theory," the court found that they likewise failed. And, while Anoushfar asked for a declaratory judgment of the amount of the alleged total loss, the court explained that the request was premature because there was no allegation that Lexington had finally denied coverage for the alleged total loss. As such, the district court found Counts I, II, and III failed to state claims on which relief could be granted and dismissed those claims with prejudice. As to

Count IV, the district court found it had no jurisdiction over the claim and dismissed it without prejudice, as Anoushfar had conceded that the bad faith claim did not present a ripe controversy.

This appeal ensued.

## II.    STANDARD OF REVEIW

We review an order granting a motion to dismiss *de novo*, taking as true the facts alleged in the complaint. *James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1273–74 (11th Cir. 2008). To survive dismissal under Rule 12(b)(6), the plaintiff's complaint "must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Boyle v. City of Pell City*, 866 F.3d 1280, 1286 (11th Cir. 2017) (quoting *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1347–48 (11th Cir. 2016)). "A claim is facially plausible when the plaintiff pleads sufficient facts to allow the court to draw the reasonable inference that the defendant is liable for the alleged misconduct." *Id.* Additionally, we review *de novo* questions of contract interpretation, and "[b]ecause insurance policies are considered contracts, '[i]nterpretation of insurance policy language is [also] a matter of law, subject to *de novo* review." *Hegel v. First Liberty Ins. Corp.*, 778 F.3d 1214, 1219 (11th Cir. 2015) (second and third alterations in original) (quoting *Graber v. Clarendon Nat'l Ins. Co.*, 819 So. 2d 840, 842 (Fla. Dist. Ct. App. 2002)).

## III.    ANALYSIS

On appeal, Anoushfar argues that the district court erred in dismissing his amended complaint. Anoushfar contends that: (1)

his amended complaint sufficiently pleaded claims for breach of contract, specific performance, and declaratory judgment; (2) the appraisal award was not, nor intended to be, the final resolution of Lexington's obligations as to the Loss; and (3) the question of total loss was not ripe for evaluation before the appraisal panel until after it issued the appraisal award.

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." For a complaint to survive a Rule 12(b)(6) motion to dismiss, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[M]ere conclusory statements[ ] do not suffice." *Gill ex rel. K.C.R. v. Judd*, 941 F.3d 504, 514 (11th Cir. 2019) (alterations in original) (quoting *Iqbal*, 556 U.S. 504, 514 (11th Cir. 2019)). And "when exhibits attached to a complaint 'contradict the general and conclusory allegations of the pleading, the exhibits govern.'" *Id.* (quoting *Griffin Indus., Inc. v. Irvin*, 4986 F.3d 1189, 1206 (11th Cir. 2007))

Under Florida law, the purpose of appraisal clauses in insurance policies is to "provide a mechanism for prompt resolution of claims and discourage the filing of needless lawsuits." *First Protective Ins. Co. v. Hess*, 81 So. 3d 482, 485 (Fla. Dist. Ct. App.

2011) (quoting *Fla. Ins. Guar. Ass'n v. Olympus Ass'n*, 34 So. 3d 791, 794 (Fla. Dist. Ct. App. 2010)); *see also Federated Nat'l Ins. Co. v. Esposito*, 937 So. 2d 199, 201–02 (Fla. Dist. Ct. App. 2006); *State Farm Fire & Cas. Co. v. Middleton*, 648 So. 2d 1200, 1201–02 (Fla. Dist. Ct. App. 1995). When an insurer "admits that there *is* a covered loss [under an insurance policy with an appraisal clause], but there is a disagreement on the *amount* of loss it is for the appraisers to arrive at the amount to be paid." *See Johnson v. Nationwide Mut. Ins. Co.*, 828 So. 2d 1021, 1025 (Fla. 2002) (emphasis in original) (quoting *Gonzalez v. State Farm Fire & Cas. Co.*, 805 So. 2d 814, 816 (Fla. Dist. Ct. App. 2000)); *Noa*, 215 So. 3d at 143 ("While issues concerning coverage challenges are exclusively for the courts, the appraisers are charged with determining the amount of the loss when an insurer admits there is a covered loss and there is a disagreement regarding the amount of the loss."). Thus, "the dollar value agreed upon by the appraisal process will be binding upon both parties." *Fla. Ins. Guar. Ass'n*, 34 So. 3d at 795 (quoting *State Farm Fire & Cas. Co. v. Licea*, 685 So. 2d 1285, 1287–88 (Fla. 1996)).

"Appraisers are expected to act on their expertise . . . [and] need to meet only to iron out any differences in their opinions." *Allstate Ins. Co. v. Martinez*, 790 So. 2d 1151, 1152 (Fla. Dist. Ct. App. 2001); *accord Allstate Ins. Co. v. Suarez*, 786 So. 2d 645, 647 (Fla. Dist. Ct. App. 2001) ("[A]ppraisers are generally expected to act on their own skill and knowledge . . . . (quoting *Liberty Mut. Fire Ins. Co. v. Hernandez*, 735 So. 2d 587, 588–89 (Fla. Dist. Ct.

App. 1999))). "[I]n evaluating the amount of loss, an appraiser is necessarily tasked with determining both the *extent* of covered damage and the *amount* to be paid for repairs." *Cincinnati Ins. Co. v. Cannon Ranch Partners, Inc.*, 162 So. 3d 140, 143 (Fla. Dist. Ct. App. 2014) (emphasis in original). Therefore, "the question of what repairs are needed to restore a piece of covered property is a question relating to the amount of 'loss' and not coverage." *Id.*

Here, Lexington admitted that the Loss was a covered loss under the Policy. The Policy's Appraisal clause provides that, when the parties fail to agree on the amount of loss, either may demand an appraisal of the loss. Once the appraisal process commences, each party's appraiser "will separately set the amount of loss," and "[i]f they fail to agree, they will submit their differences to the umpire." And a decision agreed to by any two of the two appraisers and the umpire "will set the amount of the loss." Anoushfar invoked the Appraisal clause, and the parties proceeded to appraisal as to the Loss to the Property. Upon conclusion of the appraisal process, the appraisal panel issued an award valuing the damage to the Property at $547,455.95 for its replacement cost and $504,173.54 for its actual cash value. And Lexington paid Anoushfar $420,614.94 following the appraisal award.

The district court concluded that Anoushfar should have presented the total-loss issue to the appraisal panel and was not entitled to a second appraisal to present the issue. In determining that the total loss issue was "baked into" the appraisal process, the

district court relied upon *Noa*. In *Noa*, the insured filed a claim with his insurer for damage to his roof caused by Hurricane Wilma. 215 So. 3d at 142. The parties went to appraisal, and the appraisal panel determined the amount of loss, which the insurer paid. *Id.* Less than a month after the appraisal award was entered and the award amount was paid to the insured, the insured's roofing contractor submitted a permit application to repair 30% of the roof. *Id.* However, Miami's building and zoning authority rejected the application, as the local building code did not allow for more than 25% of the total roof area to be repaired unless the entire roofing system or roof section complied with the current code. *Id.* at 142–43. Because the insured's roof did not comply with the current code, the insured's contractor prepared, and the insured signed, a contract for a full new roof. *Id.* at 143. The insured subsequently submitted the contract to the insurer with a request for funding the additional amount required as a result of the ordinance, but the insurer denied the additional claim. *Id.* The insured filed a suit in Florida court, and the state trial court ultimately denied the insured's motion for a new appraisal regarding the additional claim for an ordinance and law award. *Id.*

On appeal, the Florida appellate court declined to order a new appraisal. *See id.* at 143–44. The court explained that "to perform competently as an appraiser for this purpose, . . . logic and common sense require that an appraiser must have experience in the estimation of materials and labor costs for the repair and replacement of damaged property." *Id.* at 143. The court

further explained that, for roof work, appraisers must consider the applicable building codes in estimating repair and replacement costs. *Id.* In other words, this was "an area for professional construction industry expertise and should be 'baked into' the appraisers' and umpire's computations, and not left open for a reappraisal or for a determination by the court." *Id.* Turning to the case before it, the appellate court stated that whether a building code provision requirements placement of an entire roof if over 25% of it must be replaced was a "regulatory requirement[] known to, or knowable by, construction professionals and to be taken into account in computing the cost of the work" when conducting the appraisal. *Id.* While the appraisal award noted that "Law & Ordinance" was not appraised, the court determined that the notation did not mean that the appraisal was "subject to circumvention a month later if the insured can just find a roofing contractor to sign a proposal stating that [more than 25%] of the roof needs replacement." *Id.* at 144. The court explained that "[t]o hold otherwise would allow the insured's post-appraisal roofing contractor to step into the adjustment process as a super-umpire whose opinion supersedes the appraisal and requires a new round of valuation estimates." *Id.*

While this case does not involve an "Ordinance & Law" coverage provision, we agree with the district court that *Noa*'s reasoning is applicable here. Whether the damage to Anoushfar's Property constituted a total loss was within the appraisal panel's expertise and should have been baked into their computations.

Additionally, prior to the appraisal, Anoushfar retained a professional insurance consultant and engineering firm to estimate the RCV of the damage to the Property and received an estimate of $576,905.26, which was, at most, almost $30,000 less than the amount of the Loss the appraisal panel determined.   In other words, Anoushfar's claim that he did not realize until after the appraisal award that the damage to the Property could constitute a "total loss" is not plausible.   Thus, Anoushfar should have raised the total loss issue to the appraisal panel in the first instance, and, as the district court explained, by "having failed to do so [he] cannot receive another bite at the apple."   To hold otherwise, we would allow Anoushfar's "post-appraisal [engineer] to step into the adjustment process as a super-umpire whose opinion supersedes the appraisal and requires a new round of valuation estimates." *See id.*

Additionally, Anoushfar contends that the "to be determined" language in the "Ordinance & Law," "Personal Property," and "Loss of Use/ALE" coverage categories on the appraisal award form means that the appraisal panel intended to hold future proceedings upon *all* aspects of the award.   Based on the facts of the case, we disagree.   We first note that Anoushfar has not alleged that the "total loss" would fall under either the "Personal Property" or the "Loss of Use/ALE" coverage categories.   And, as Anoushfar admits in his reply brief, he does not seek coverage

under "Ordinance & Law."[1]   Rather, he seeks to be paid the remaining balance of the Policy's amount for "Coverage A: Dwelling" for the Loss to the Property, which was already evaluated by the appraisal panel.

Below, the district court, relying on *Noa*, explained that "[t]he fact that some items on the appraisal form are 'to be determined' does not imply that the appraisal panel will reconvene to determine those amounts." *Cf. id.* at 143 (declining to order a new appraisal where the notation on the appraisal award stated that "Law & Ordinance" was not appraised).  But, even assuming for the sake of Anoushfar's argument that the appraisal award was not final as to the "Ordinance & Law," "Personal Property," and "Loss of Use/ALE" coverage categories such that he could go to appraisal on those categories, he cannot reopen the appraisal to present an issue he could have previously raised to the appraisal

---

[1] Additionally, as Lexington notes in its answer brief, the "Ordinance Or Law" section of the Policy provides that that an insured "may use up to 10% of the limit of liability that applies to Coverage A for the increased costs [the insured] *incur[s]* due to the enforcement of" certain types of ordinances and laws. (emphasis added).  However, based on the amended complaint's allegations, Anoushfar did not *incur* such costs; instead, he sold the Property in "as is" condition before the appraisal process began.  Therefore, it appears that, even if Anoushfar claimed that the total loss fell under the "Ordinance Or Law" coverage category, he would not be entitled to an amount under that category, as he never incurred the increased cost of construction.

panel on losses the panel already considered and determined an appraisal award for.[2] *See id.* at 144.

Turning to Anoushfar's claims, we agree with the district court that Anoushfar failed to state plausible claims to survive Lexington's Rule 12(b)(6) motion to dismiss. As to the breach of contract claim, for the reasons discussed above, Lexington did not breach the Policy's Appraisal clause by not paying Anoushfar the remainder of the Policy's limits for Coverage A or going to a second appraisal panel on determining whether the Loss to the Property constituted a total loss under the Policy. As such, he has not stated a plausible breach of contract claim.

As to the specific performance claim, under Florida law, "[s]pecific performance shall only be granted when 1) the plaintiff is clearly entitled to it, 2) there is no adequate remedy at law, and 3) the judge believes that justice requires it." *Castigliano v.*

---

[2] We also find Anoushfar's reliance on *Jossfolk v. United Property & Casualty Insurance Co.*, 110 So. 3d 110 (Fla. Dist. Ct. App. 2013), misplaced. The Florida appellate court in *Jossfolk* was faced with an award stating that "Ordinance and Law" was "not appraised." *Id.* at 112. Following the award, the insured was forced to replace the entire roof, as a local ordinance prevented him from replacing only a portion of the roof. *See id.* The *Jossfolk* court determined that the appraisal panel had not denied coverage for "Ordinance and Law," as the claim thereunder was not "incurred" at the time of the appraisal. *See id.* at 113. Unlike *Jossfolk*, however, Anoushfar is *not* seeking ordinance and law coverage but is instead seeking to present an issue—the total loss question—to another appraisal panel when (1) the total loss question was "baked into" the appraisers' computations and (2) he could have presented the issue during the first appraisal. *See Noa*, 215 So. 3d at 143–44.

*O'Connor*, 911 So. 2d 145, 148 (Fla. Dist. Ct. App. 2005). Here, Anoushfar seeks specific performance in the form of an order compelling Lexington to engage in appraisal proceedings on the total loss question. However, as discussed above, he is not clearly entitled to a second appraisal on the total loss question, given that the issue was "baked into" the appraisal award and that he could have explicitly raised the issue to the previous appraisal panel. Therefore, he has not stated a plausible claim for relief as to the specific performance.

Turning to the declaratory judgment claim, the Declaratory Judgment Act provides that "[i]n a case of actual controversy," a court, "upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). A "case of actual controversy" refers to the type of "Cases" and "Controversies" justiciable under Article III of the United States Constitution. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). To determine whether there is a case of actual controversy, courts look to "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). In deciding whether to consider a declaratory judgment claim, a court is left with "an ample degree of discretion." *Kerotest Mfg. Co. v. C-O-Two Fire*

*Equip. Co.*, 342 U.S. 180, 183–84 (1952); *accord Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) ("Consistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment before trial or after all arguments have drawn to a close.").

For similar reasons as the breach of contract and specific performance claims, we find that the district court did not err in exercising its discretion and dismissing Anoushfar's declaratory judgment claim. As the district court recognized, Anoushfar sought a declaration that he is entitled to another appraisal proceeding under the Policy to raise the total loss issue or, alternatively, that he is entitled to all insurance benefits owed to him as a result of the Loss, including the amount he claims that he is owed under the Policy for the Loss being a "total loss." But, as discussed above, the total loss issue was "baked into" the appraisal panel's computations and, given the facts of the case, Anoushfar could have presented the issue to the panel during that appraisal. *See Noa*, 215 So. 3d at 143–44. As such, he is not entitled to another appraisal to determine whether the Loss to the Property constitutes a total loss under the Policy.

As Anoushfar has failed to state plausible claims for relief as to his specific performance, declaratory judgment, and breach of contract claims, the district court did not err in granting Lexington's motion to dismiss under Rule 12(b)(6).

## IV.    CONCLUSION

For the foregoing reasons, we affirm the district court's order dismissing Anoushfar's amended complaint.

**AFFIRMED.**