[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13761

_____

KELLY B. MATHIS,
an individual,
K.B. MATHIS, PA,
a Florida professional association,

Plaintiffs-Appellants,

*versus*

DONALD ESLINGER,
an individual,
JAMES "SAMMY" GIBSON,
an individual,
APRIL KIRSHEMAN,
an individual,
PAMELA J. BONDI,
an individual,

NICHOLAS COX,
an individual,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:19-cv-00274-BJD-JRK

_____

Before JILL PRYOR, GRANT, and ANDERSON, Circuit Judges.

PER CURIAM:

For several years, Florida attorney Kelly Mathis and his law firm, K.B. Mathis, PA, represented Allied Veterans of the World and Affiliates, Inc. ("AVW"). AVW and related entities (its "affiliates") operated about 50 internet cafes in Florida where customers allegedly used computers to engage in illegal slot-machine gambling.

Law enforcement officials investigated AVW's operations and ultimately charged approximately 50 people, including Mathis, with racketeering and other crimes under Florida law. As part of the investigation, officers searched the law firm's offices, seized its records, and froze its bank accounts. Initially, a jury found Mathis guilty of nearly all the charged offenses. But after a Florida

appellate court vacated his convictions, the State dropped the charges against Mathis.

Mathis filed this action, bringing claims under 42 U.S.C. § 1983 against Donald Eslinger, Seminole County Sheriff; James Gibson, a Captain with the Seminole County Sheriff's Department; April Kirsheman, general counsel to the Seminole County Sheriff's Department; Pam Bondi, Florida Attorney General; and Nicholas Cox, an attorney with the Statewide Prosecutor Office of the Attorney General. According to the amended complaint, the affidavit prepared to secure Mathis's arrest included false statements and omitted material information. After eliminating the false statements and adding the omitted information, the amended complaint alleged, there was no probable cause for Mathis's arrest. The district court dismissed the amended complaint, determining for each claim that the defendants were entitled to absolute immunity or qualified immunity. After careful consideration and with the benefit of oral argument, we affirm.

## I.    BACKGROUND

This case arises out of actions that Mathis and the law firm took while providing legal representation to, or lobbying on behalf of, AVW, its affiliates, and individuals associated with these entities. In this section, we begin by reviewing how AVW's internet cafes operated. Next, we discuss the work that Mathis and the law firm performed for AVW, its affiliates, and related individuals. We

then discuss the criminal proceedings against Mathis. We conclude this section by setting forth the procedural history of this case.[1]

## A.    AVW's Internet Cafes

Beginning in 2007, AVW and its affiliates opened internet cafes in Florida. Customers would purchase internet time to use at the cafes' computers, paying about 20 cents per minute. When a customer purchased internet time, he received free entries into promotional sweepstakes.

Customers would play games on the computers to reveal whether they had a winning sweepstakes entry. The games had names like Captain Cash, Lucky Shamrocks, Smokin 7's, and Money Bunny. Each game displayed "the results of the sweep-stakes entries by graphic animation that simulated the spinning of slot machine reels." Doc. 64 ¶ 14.[2]

If the simulated spin revealed that the customer had a win-ning sweepstakes entry, he would receive credits. The customer

---

[1] The facts recited in this section are taken from the amended complaint, which is the operative complaint. *See Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1218 n.2 (11th Cir. 2016) ("At the motion to dismiss stage, we accept the well-pleaded allegations in the complaint as true and view them in the light most favorable to the [non-movant]."). We also consider the content of the affidavit that was submitted to the state court judge to obtain Mathis's arrest warrant because the affidavit was "referred to in the complaint, central to the plaintiff's claim[s], and of undisputed authenticity." *Luke v. Gulley (Luke I)*, 975 F.3d 1140, 1144 (11th Cir. 2020) (internal quotation marks omitted).

[2] "Doc." numbers are the district court's docket entries.

could use the credits to play additional rounds of the games or redeem the credits for cash. When a customer used up his credits, he could purchase more internet time to receive additional sweepstakes entries and continue playing the games. Some customers spent tens of thousands of dollars at the cafes, purchasing more than 100,000 minutes of internet time to play the sweepstakes games and try to win cash prizes.

The cafes operated for several years and generated over $300 million in revenue. According to AVW, it paid out approximately 65 percent of the proceeds it received as prizes to customers and gave more than $5 million to charities supporting veterans.

## B.    Mathis's Representation of AVW

Over a six-year period, Mathis and his law firm performed legal work for AVW and its affiliates. For this work, Mathis and the law firm earned substantial fees—more than $3 million. The services Mathis and the law firm provided included giving legal advice related to cafe operations; lobbying government officials on AVW's behalf; and representing, in civil and criminal litigation, AVW, its affiliates, and related individuals.

### 1.    Services Related to Cafe Opening and Operations

Mathis and the law firm regularly provided legal advice and services to AVW and the affiliates about the operation of the cafes.

Before opening any cafes, AVW sought legal advice from Mathis about whether it could legally operate the cafes under

Florida law. Mathis advised AVW of the parameters under which it could conduct sweepstakes games.

After receiving this advice, AVW began to open cafes. For each location, AVW set up a separate affiliate, which was a subsidiary of AVW, to operate the cafe. Jerry Bass and Johnny Duncan, who together controlled AVW, met with Mathis to decide where each new affiliate would be located. Mathis and his law firm then would prepare and file the paperwork to create the new affiliate. Mathis served as the registered agent for AVW and most of the affiliates.

Once the cafes began operating, Mathis and the law firm advised AVW and the affiliates on business issues that arose. When some of the affiliates' landlords complained about the cafes' operations, Mathis met with Bass and Duncan to come up with a solution. Together, they created a new policy for AVW and the affiliates, which instructed employees to avoid "excessive police calls." Doc. 74-4 at 14. AVW and the affiliates relied on the law firm to communicate the new policy, and they instructed employees at the cafes to call the law firm if they had any questions.

AVW also relied on Mathis and his law firm to communicate with third parties who had questions about the sweepstakes. AVW advised cafe employees to direct any questions from customers or the media about AVW or how the sweepstakes operated to Mathis or another attorney at his law firm.

In 2009, when customer Jeannette Hinkson had detailed questions about how the cafes operated, AVW relied on Mathis to answer her questions. In a single year, Hinkson spent over $66,000 at a cafe. After AVW reported to the Internal Revenue Service ("IRS") that Hinkson received over $48,000 in winnings for the year, the IRS attempted to collect taxes on this amount. Hickson did not believe that the entire amount should be taxed as income and requested additional documentation from AVW to support her position that she suffered a net loss that year from playing sweepstakes at the cafes.

Mathis responded to Hickson on AVW's behalf. He informed her that AVW did not have the additional documentation she requested. He told her that the company's only records of the amount of internet time she had purchased were "the Attorney General sheets that we report to the Florida Attorney General every year" and that, to compile this information, the company would need "to sift through a warehouse" full of documents. Doc. 74-3 at 31. But, in fact, no such sheets or reports were submitted to the Florida Attorney General. And, contrary to Mathis's statement about the need to sift through a warehouse for the information Hickson requested, the company maintained data on its computer system showing how much internet time each customer purchased.

### 2. Lobbying Work

Mathis and his law firm also performed lobbying activities for AVW and its affiliates. When AVW sought to open cafes in new

cities, Mathis would meet with local government officials and law enforcement officers to persuade them of the legality of AVW's operations. When Florida's legislature and local governments considered laws or ordinances that would have restricted the cafes' operations, AVW again relied on Mathis to lobby on its behalf.

In performing these activities, Mathis answered questions and provided government officials with information about how the cafes operated. For example, in 2011, when Seminole County considered an ordinance that would bar the operations of the internet cafes, Mathis told county commissioners that AVW and its affiliates were permitted to operate the sweepstakes under Florida law and that there was neither a statute prohibiting the cafes' business nor a decision by a judge saying that AVW was operating illegally. When someone mentioned that the cafes' customers included compulsive gamblers who were losing tens of thousands of dollars at the cafes, Mathis denied it, saying that customers usually spent only 20 to 30 dollars at a time. Notably, Mathis made this statement after he communicated with Hinkson, who told him that she had lost tens of thousands of dollars.

AVW also relied on Mathis and his law firm to communicate with local governments to verify that AVW and its affiliates were complying with ordinances regulating the cafes. A Leon County ordinance required AVW to place $50,000 in a trust account to cover any prizes won in sweepstakes operated in that county. Mathis submitted a sworn affidavit certifying to the county that the law firm had received a $50,000 deposit from AVW and was

holding the money in its trust account, as required by the ordinance. But records from the law firm's trust account showed no such deposit.

### 3.  Representation of AVW, Its Affiliates, and Related Individuals in Criminal and Civil Litigation

Mathis and the law firm also represented AVW, the affiliates, and related individuals in civil and criminal litigation.

Mathis and the firm represented AVW and individuals who worked at the cafes in several criminal cases. In 2008, law enforcement officers in Pinellas County arrested James Michael Hill, who managed a cafe, and charged him with gambling-related state crimes. The officers seized more than 60 "slot machines," which were the computers customers used at the cafe. In the criminal proceedings, Mathis represented Hill, who ultimately pled no-contest to 12 counts of possession of a slot machine. In connection with Hill's guilty plea, the court ordered the slot machines destroyed. Mathis persuaded the court to seal the records from this criminal case, effectively concealing Hill's plea from the public.

In 2009, in connection with another investigation into illegal gambling, law enforcement officers in Jackson County obtained a search warrant for a cafe and seized its computers. Mathis acted as AVW's attorney. He negotiated and signed an agreement in which AVW agreed to forfeit the computers and close the cafe in exchange for no criminal or civil action being taken against it.

The next year, law enforcement officials in Marion County investigated another AVW internet cafe. Jeaneen Crisante, who operated the cafe, was charged in state court with gambling-related crimes. Mathis, who represented Crisante in the criminal case, filed a motion to dismiss, arguing that the cafe's business was lawful. The trial court denied the motion, concluding, for purposes of the motion to dismiss, that the cafe's computers qualified as slot machines under Florida law. A jury found Crisante not guilty, however.

Mathis also filed several civil lawsuits on behalf of AVW to challenge government actions regulating the cafes. In 2009, after law enforcement officials in the city of Longwood shut down an AVW cafe, Mathis filed on AVW's behalf a lawsuit challenging the closure. During discovery, Longwood requested detailed financial information from AVW, but the company refused to produce it. When the state court ordered AVW to turn over the records, Mathis dismissed the suit so that the company would not have to produce any financial information.

In 2011, after Seminole County passed an ordinance that banned AVW's affiliated cafes from operating, Mathis filed on AVW's behalf a federal lawsuit challenging the ordinance as unconstitutional. During discovery, Seminole County requested financial records from AVW, and the district court ordered the company to produce the records. To keep AVW from having to produce its financial records, Mathis filed a motion for voluntary dismissal, stating that AVW and its affiliates had sold the cafes in Seminole

County to a new owner who no longer wished to pursue the litigation.[3] In fact, AVW and the affiliates continued to operate the cafes. They merely changed the names of some of the cafes to make it appear that the cafes had been sold to new owners. Both before and after the name changes, Mathis served as the registered agent for most of these affiliates.

## C.    Mathis's Arrest and Criminal Trial

Law enforcement officials in several Florida counties who were working with the Florida Department of Law Enforcement investigated AVW's operations. Based on the investigation, Gibson prepared a 441-page probable cause affidavit ("Master Affidavit") detailing how more than 50 defendants, including Mathis and the law firm, allegedly committed hundreds of crimes in connection with the cafes' operation.

The Master Affidavit set forth the relationship among AVW and the affiliates. It identified the individuals tied to each affiliate's operations. One section identified the individuals who "own[ed], operate[d], manage[d], supervise[d], or [were] employees of" each affiliate. *See, e.g.*, Doc. 74-1 at 61. Mathis was not listed among the owners, operators, managers, supervisors, or employers for any affiliate. However, the Master Affidavit alleged that AVW, Duncan, Bass, Mathis, the law firm, and other co-defendants "own[ed],

---

[3] Mathis made a similar representation to a Florida state agency, telling it that AVW had transferred ownership of nearly all the internet cafes to "non-affiliated companies" and was "no longer operating the locations." Doc. 74-3 at 73.

operate[d], manage[d], and/or control[led]" the locations where the illegal activity had occurred. *See, e.g.*, Doc. 74-4 at 18. Another section of the Master Affidavit included a chart that listed the "Corporate Officers & Registered Agent" for each affiliate. Doc. 74-1 at 35–37. Because Mathis was the registered agent for most of the affiliates, his name was repeatedly listed in this section.

The Master Affidavit alleged that there was a "continuous ongoing pervasive effort to organize, maintain, protect, expand, and benefit from the statewide gambling efforts of the assorted enterprises of" AVW and its affiliates. Doc. 74-3 at 80. It explained that to ensure illegal gambling could continue at the cafes, it was "imperative to . . . conceal[]" information about the "manner in which the enterprise operate[d]" and to hide information about the "flow of the illegal proceeds" it generated. *Id.* The Master Affidavit alleged that Mathis and the law firm "participated" in these efforts. *Id.* It set forth in detail the work that Mathis and the law firm performed for AVW, its affiliates, and related individuals. The Master Affidavit described the payments the law firm received from AVW and its affiliates as "proceeds derived . . . from the illegal gambling operations of [AVW]." Doc. 74-2 at 56.

The Master Affidavit was presented to a state court judge to obtain arrest warrants for Mathis and others. Mathis was charged with offenses under Florida law including racketeering, conspiracy to commit racketeering, possessing a slot machine, conducting an illegal lottery, keeping a gambling house, and money laundering.

Based on the Master Affidavit, law enforcement officers also seized documents from the law firm and froze its bank accounts.

At his criminal trial, Mathis claimed that he lacked the requisite *mens rea* for the charged offenses because he believed that AVW's sweepstakes were legal under Florida law. *See Mathis v. State*, 208 So. 3d 158, 159–61 (Fla. Dist. Ct. App. 2016). By contrast, the State argued that Mathis knew AVW's sweepstakes games were illegal and that he had engaged in deceptive conduct by misrepresenting to government officials the nature of AVW's operations to make it appear as though AVW was running a legal sweepstakes. *See id.* at 161–62. Although the trial court allowed the State to introduce evidence to show Mathis's knowledge, it barred Mathis from introducing evidence to support his position that he believed the cafes' operations were legal, ruling such evidence was irrelevant. *See id.* at 161.

A jury found Mathis guilty of all the charged offenses except conspiracy to commit racketeering. He was sentenced to six years' imprisonment.

Mathis challenged his convictions on appeal, arguing that the trial court erred in excluding his evidence. A Florida appellate court concluded that the trial court had improperly barred Mathis from introducing evidence "to rebut the State's allegations that he knowingly assisted [AVW] in violating Florida law." *Id.* at 164. The appellate court reversed his convictions and remanded for a new trial. On remand, the State dismissed the charges against Mathis.

### D.    Mathis's Lawsuit

Mathis filed this civil action in which he brought claims under 42 U.S.C. § 1983 against Eslinger, Gibson, Kirsheman, Bondi, and Cox. In the amended (operative) complaint, he alleged that the Master Affidavit included omissions and misrepresentations that, if corrected, would have defeated probable cause to arrest and detain him.

The amended complaint raised the following claims: (1) Mathis was arrested and incarcerated without probable cause, in violation of the Fourth Amendment (Count II); (2) the defendants engaged in malicious prosecution and conspired to commit malicious prosecution based on the initiation of criminal proceedings against Mathis without probable cause (Counts III & IV); and (3) the defendants committed abuse of process based on their misuse of the criminal court process for improper motives (Count V).[4]

---

[4] The amended complaint also included other claims that the district court dismissed: a claim under 42 U.S.C. § 1983, alleging that the defendants violated the First Amendment by engaging in a retaliatory investigation and prosecution, and several state-law claims. The dismissal of these claims is not before us on appeal. In the argument section of his opening brief on appeal, Mathis devotes just one paragraph to the dismissal of the First Amendment claim and one sentence to the dismissal of the state law claims. He provides no citations to support his position that the district court erred in dismissing these claims. Because Mathis makes no more than "passing references" to these claims and "cites no authorities to support [his] conclusory assertions" that the district court erred in dismissing the claims, we conclude that he abandoned any

20-13761               Opinion of the Court               15

The defendants filed motions to dismiss the amended complaint. The prosecutors (Bondi, Cox, and Kirsheman) argued that they were entitled to absolute immunity. Eslinger and Gibson argued that they were entitled to qualified immunity.

The magistrate judge recommended that the district court dismiss the amended complaint with prejudice. First, the magistrate judge determined that the prosecutors were entitled to absolute immunity. They were entitled to absolute immunity, the magistrate judge concluded, because the claims against them arose out of actions they took in their role as advocates for the State in Mathis's criminal proceedings.

Second, the magistrate judge concluded that Eslinger and Gibson were entitled to qualified immunity. The magistrate judge explained that qualified immunity turned on whether the Master Affidavit established probable cause to arrest Mathis. The magistrate judge rejected Mathis's contention that if the omissions and misrepresentations in the Master Affidavit had been corrected, there would not have been arguable probable cause to arrest him.

Mathis objected to the magistrate judge's recommendation. The district court overruled the objections, adopted the magistrate judge's recommendation, and granted the defendants' motions to dismiss. Regarding arguable probable cause, the district court explained that the relevant question was whether the "alleged

---

challenge to the dismissal of these claims; we address them no further. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 679, 682 (11th Cir. 2014).

misstatements and omissions negated [arguable] probable cause that [Mathis was] involved in the subject criminal enterprise." Doc. 96 at 8. Although the amended complaint alleged that some statements in the Master Affidavits were false, "there [were] no allegations that [other of] the underlying facts attested to in the Master Affidavit . . . were false." *Id.* at 9. Based on the unchallenged statements in the Master Affidavit, the district court concluded that there was arguable probable to conclude that Mathis was a "knowing participant[] in an illegal enterprise," and thus Eslinger and Gibson were entitled to qualified immunity. *Id.*[5]

This is Mathis's appeal.

## II.    STANDARD OF REVIEW

We review *de novo* whether an official is entitled to absolute immunity or qualified immunity. *See Paez v. Mulvey*, 915 F.3d 1276, 1284 (11th Cir. 2019); *Stevens v. Osuna*, 877 F.3d 1293, 1301 (11th Cir. 2017). At the motion to dismiss stage, we "accept[] the factual allegations in the complaint as true and draw[] all reasonable inferences in the nonmoving party's favor." *Paez*, 915 F.3d at

---

[5] In the amended complaint, the law firm was also a plaintiff, alleging a § 1983 claim based on a Fourth Amendment violation and a state-law abuse-of-process claim. The district court dismissed these claims for the same reasons that it dismissed Mathis's claims: because the prosecutors were entitled to absolute immunity and Eslinger and Gibson were entitled to qualified immunity. Although we discuss only Mathis's claims in the text, we affirm the dismissal of the law firm's claims for the same reasons.

1284 (alteration adopted) (internal quotation marks omitted); *see Stevens*, 877 F.3d at 1301 (applying same standard to review grant of absolute immunity at motion to dismiss stage).

Although we ordinarily liberally construe *pro se* pleadings, this rule does not apply when the *pro se* litigant is a lawyer. *See Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1306 n.1 (11th Cir. 2018).

### III.    DISCUSSION

On appeal, Mathis challenges the district court's conclusions that the prosecutor defendants were entitled to absolute immunity and that Eslinger and Gibson were entitled to qualified immunity. We address each challenge in turn.

### A.    The District Court Did Not Err in Concluding That the Prosecutors Enjoyed Absolute Immunity.

We begin by considering whether the prosecutors were entitled to absolute immunity. "Traditional common-law immunities for prosecutors apply to civil cases brought under § 1983." *Rehberg v. Paulk*, 611 F.3d 828, 837 (11th Cir. 2010). Prosecutors enjoy "absolute immunity for all activities that are intimately associated with the judicial phase of the criminal process." *Id.* (internal quotation marks omitted). The purpose of this immunity to "prevent[] harassment by unfounded litigation which could cause a deflection of the prosecutor's energies from his public duties and limit the prosecutor's independence of judgment." *Kassa v. Fulton Cnty.*, 40 F.4th 1289, 1292 (11th Cir. 2022) (internal quotation marks

omitted). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified . . . ." *Id.* (internal quotation marks omitted).

We apply a "functional approach" to determine whether a prosecutor is entitled to absolute immunity. *Id.* at 1293. This "fact-specific inquiry" requires us to "look[] to the nature of the function performed, not the identity of the actor who performed it." *Id.* at 1292 (internal quotation marks omitted). Under the functional approach, "a prosecutor is entitled to absolute immunity for acts undertaken in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the state." *Id.* at 1293 (alterations adopted) (internal quotation marks omitted). When "a prosecutor functions in a capacity unrelated to his role as an advocate for the state, he is not protected by absolute immunity." *Rehberg*, 611 F.3d at 838. Prosecutors are not entitled to absolute immunity when they "conduct[] investigative work before an arrest, mak[e] statements to the press, [or] provid[e] legal advice to police regarding pre-indictment investigation techniques." *Hart v. Hodges*, 587 F.3d 1288, 1296 (11th Cir. 2009) (citations omitted).

In this case, we conclude that the prosecutors were entitled to absolute immunity because the claims against them arose from actions they took in performing their role as advocates for the State when they prepared for the initiation of judicial proceedings against Mathis and for his trial. *See, e.g.*, Doc. 64 at ¶¶ 75 (alleging that the defendants were liable because "Mathis'[s] arrest,

incarceration, and conviction constituted an unreasonable seizure and, thus, a violation of his Fourth Amendment rights"); 79 (alleging that defendants were liable for malicious prosecution because they "initiated criminal proceedings against Mathis without probable cause"); 86 (alleging defendants were liable for conspiracy to commit malicious prosecution because they "initiate[d] criminal proceedings against Mathis without probable cause"); 93 (alleging that defendants were liable for abuse of process because they "misused the criminal court process").

On appeal, Mathis does not dispute that prosecutors generally are entitled to immunity for actions taken in connection with an arrest, incarceration, and prosecution. He nevertheless argues that the prosecutors were not entitled to absolute immunity because they engaged in misconduct "prior to the arrest" and that the "arrest, incarceration, and prosecution [were] simply the result of the misconduct." Appellants' Br. at 33. But the well-pled allegations in the amended complaint do not support this argument.

The thrust of the amended complaint was that the prosecutors were liable because they initiated a criminal case when they knew there was no probable cause to believe that Mathis had committed a crime. *See* Doc. 64 at ¶¶ 34 (alleging that the prosecutors were liable because they "approved of, and/or directed, the arrest of Mathis despite the lack of probable cause"); 37 (alleging that the prosecutors engaged in "the concoction of false charges"). The amended complaint also alleged that the prosecutors were liable because of other actions they took in pre-trial proceedings,

including decisions they made about Mathis's bond and how they conducted plea negotiations. Notably, the amended complaint included no well-pled allegation that the prosecutors themselves conducted any investigative work before Mathis's arrest. *See Hart*, 587 F.3d at 1295. Because the allegations in the amended complaint show that the claims against the prosecutors arose solely out of actions they took in initiating the criminal case and preparing for trial, we conclude that the prosecutors were entitled to absolute immunity. *See Kassa*, 40 F.4th at 1293.

## B.    The District Court Did Not Err in Concluding That Gibson and Eslinger Were Entitled to Qualified Immunity.

We now turn to whether Eslinger and Gibson were entitled to qualified immunity. "Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019) (internal quotation marks omitted). To receive qualified immunity, a defendant "bears the initial burden to prove that he acted within his discretionary authority." *Dukes v. Deaton*, 852 F.3d 1035, 1041 (11th Cir. 2017). The plaintiff then bears the burden of proving that "(1) the defendant violated a constitutional right; and (2) the right was clearly established at the time of the violation." *Barnes v. Zaccari*, 669 F.3d 1295, 1303 (11th Cir. 2012). Because it is undisputed that Eslinger and Gibson were acting within the scope of their discretionary authority, Mathis had the

burden to show that the officers violated a constitutional right and that the constitutional right was clearly established at the time of the violation.

Mathis argues that Eslinger and Gibson violated his clearly established right to be free from an unreasonable seizure resulting from malicious prosecution. In this section, we begin by explaining what a plaintiff must prove to establish a constitutional violation based on malicious prosecution. We then explain why the allegations in the complaint were insufficient to establish that Eslinger and Gibson violated a clearly established constitutional right.

We recently "simplified our standard for malicious prosecution into two elements: the plaintiff must prove (1) that the defendant violated his Fourth Amendment right to be free from seizures pursuant to legal process and (2) that the criminal proceedings against him terminated in his favor." *Luke v. Gulley (Luke II)*, 50 F.4th 90, 95 (11th Cir. 2022) (internal quotation marks omitted). To establish a Fourth Amendment violation, a plaintiff must prove that "the legal process justifying his seizure was constitutionally infirm and that his seizure would not otherwise be justified without legal process."[6] *Id.* (internal quotation marks omitted).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures."

---

[6] We assume for purposes of this appeal that the criminal proceedings against Mathis terminated in his favor.

U.S. Const. amend. IV. It provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." *Id.* Under the Fourth Amendment, "before a warrant for arrest can issue the judicial officer issuing such a warrant must be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant." *Luke II*, 50 F.4th at 95 (alterations adopted) (internal quotation marks omitted). For a malicious prosecution claim, the determination of probable cause turns on "what the affidavit charging the plaintiff stated." *Williams v. Aguirre*, 965 F.3d 1147, 1163 (11th Cir. 2020) (alterations adopted) (internal quotation marks omitted). The "warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause." *Franks v. Delaware*, 438 U.S. 154, 165 (1978).

Probable cause is established "when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Paez*, 915 F.3d at 1285 (internal quotation marks omitted). Probable cause "is not a high bar"; it "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotation marks omitted). "So long as it is reasonable to conclude from the body of evidence as a whole that a crime was committed, the presence of some conflicting evidence or a possible

defense will not vitiate a finding of probable cause." *Paez*, 915 F.3d at 1286.

"[A]n arrest warrant is constitutionally infirm when . . . an official, including an individual who did not apply for the warrant, intentionally or recklessly made misstatements or omissions necessary to support the warrant." *Luke II*, 50 F.4th at 95–96 (internal quotation marks omitted).[7] We apply a two-part test to determine whether misstatements or omissions in an officer's warrant affidavit amount to a Fourth Amendment violation. *Paez*, 915 F.3d at 1287. First, we consider "whether there was an intentional or reckless misstatement or omission." *Id.* Second, "we examine the materiality of the information by inquiring whether probable cause would be negated if the offending statement was removed or the omitted information included." *Id.* If the warrant affidavit (including the omitted information or correcting the misstated information) "would have demonstrated even arguable probable cause—that a reasonable officer *could have* believed an offense was

---

[7] An arrest warrant also is constitutionally infirm when "the officer who applied for the warrant should have known that his application failed to establish probable cause." *Luke II*, 50 F.4th at 95–96 (internal quotation marks omitted). Here, Mathis relies solely on the argument that the warrant was constitutionally infirm because of omissions or misstatements in the warrant affidavit.

24                    Opinion of the Court                    20-13761

committed—then the officers are entitled to qualified immunity." *Id.* at 1288.[8]

We now apply this two-part test to determine whether Mathis's arrest was constitutionally infirm because Eslinger and Gibson intentionally or recklessly made misstatements or omissions in the Master Affidavit. Mathis does not dispute that the substance of the Master Affidavit was sufficient to establish probable cause that all the other defendants committed the charged crimes. But after removing the misstatements and adding the material information that was omitted, he says, the Master Affidavit contained insufficient information to establish that he "knowingly assisted [AVW] to commit a crime," rendering the Master Affidavit constitutionally infirm. Appellants' Br. at 9 (emphasis omitted).[9] We

---

[8] Mathis brought separate § 1983 claims alleging violations of the Fourth Amendment, malicious prosecution, conspiracy to commit malicious prosecution, and abuse of process. On appeal Mathis appears to have lumped all the claims together. For all the claims, he treats qualified immunity as turning on the question of whether, if the alleged misstatements and omissions in the Master Affidavit had been corrected, there would have been arguable probable cause for his arrest. We thus limit our analysis to this question.

[9] We have previously recognized that the "any-crime rule," under which an officer who makes a warrantless arrest is insulated from liability so long as probable cause existed to arrest the suspect for some crime, does not apply in the malicious prosecution context. *Williams*, 965 F.3d at 1162. Accordingly, a plaintiff who was charged with multiple crimes may establish a claim for malicious prosecution by showing that the officers lacked probable cause to arrest him for at least one charged crime. *Id.*

disagree. Eslinger and Gibson were entitled to qualified immunity because they had at least arguable probable cause to believe that Mathis knowingly assisted AVW in committing a crime.[10]

At the first step of our two-part test, we ask "whether there was an intentional or reckless misstatement or omission" in the Master Affidavit. *Paez*, 915 F.3d at 1286. The amended complaint alleged that the Master Affidavit contained several misstatements and omissions that Eslinger and Gibson "intentionally" made. Doc. 64 at ¶¶ 39, 41. Because this case is at the motion to dismiss stage, we accept the amended complaint's well-pled allegations that

---

Although Mathis was charged with multiple crimes, he raises a single argument that applies to each crime, challenging only whether the allegations in the Master Affidavit were sufficient to establish that he was a knowing participant in the criminal scheme. Because he does not tether his intent-based argument to any of the particular elements required for any of the charged crimes, we limit our analysis to whether the Master Affidavit established that there was probable cause that he knowingly assisted AVW in committing a crime.

[10] Mathis also argues that because this case was at the motion to dismiss stage, it was "premature" for the district court to consider the Master Affidavit. Appellants' Br. at 14. We disagree. At the motion to dismiss stage, we may consider the substance of the arrest affidavit to determine whether there would have been arguable probable cause if the alleged misstatements or omissions had been corrected. *See Paez*, 915 F.3d at 1287–88 (reversing denial of qualified immunity to officers on malicious prosecution claim at the motion to dismiss stage when, after considering the information that allegedly had been omitted from the arrest affidavits together with the information in those affidavits, the officers still would have had probable cause to believe that the plaintiffs had committed a crime).

Eslinger and Gibson intentionally or recklessly omitted the following information from the Master Affidavit:

- Florida's Commissioner of Agriculture had stated that the internet cafes' operations were legal;

- The Florida Senate twice investigated the internet cafes and had not concluded that they were illegal;

- Local governments in Florida had passed municipal ordinances regulating and permitting internet cafes;

- At least three law review articles had opined that the internet cafes were legal; and

- No Florida court had found the internet cafes' operations illegal.

Mathis also alleged that the Master Affidavit misstated that he "was a corporate officer" for AVW and the affiliates. *Id.* at ¶ 36. Even though at the motion to dismiss stage we generally accept the allegations in a complaint as true, *see Paez*, 915 F.3d at 1284, we do not credit this allegation. The amended complaint's allegation about the content of the Master Affidavit is directly contradicted by the Master Affidavit itself. The Master Affidavit identified each of the corporate officers for AVW but did not list Mathis. Mathis points out that he was included in a chart that listed the "Corporate Officers & Registered Agent" for each affiliate. Doc. 74-1 at 35–37. But the Master Affidavit reflects that Mathis was included in this chart because he was the registered agent for AVW and many of

the affiliates. (There is no dispute that Mathis was, in fact, the registered agent.) Because the Master Affidavit never stated that Mathis was a corporate officer of AVW or any affiliate, we do not credit the amended complaint's allegation that the Master Affidavit included such a statement. See Gill ex rel. K.C.R. v. Judd, 941 F.3d 504, 514 (11th Cir. 2019) (explaining that when a document contradicts the complaint's allegations "about what the document is or says," the document governs (internal quotation marks omitted)).

In the amended complaint, Mathis alleged that the Master Affidavit contained other "mischaracterizations, false impressions, false statements, exaggerations, and omissions." Doc. 64 at ¶ 44. But because the amended complaint never identified these additional misstatements and omissions, we disregard this conclusory allegation. See Franklin v. Curry, 738 F.3d 1246, 1251 (11th Cir. 2013) (explaining that a court disregards "conclusory allegations" because they "fail to apprise defendants of the factual basis of the plaintiff's claims"); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (explaining that a plaintiff cannot rely on "naked assertions devoid of further factual enhancement" (alteration adopted) (internal quotation marks omitted)).

In a previous case in the malicious prosecution context, we disregarded a similar allegation that an officer made "material misstatements and omissions" in an arrest affidavit. Gill, 941 F.3d at 515 (internal quotation marks omitted). We explained that this type of "general" statement was "so broad that it provides us no help in determining which statements in the affidavit are material

misstatements or what has been omitted." *Id.* Consistent with *Gill*, we do not consider the amended complaint's conclusory allegation that the Master Affidavit contained other, unidentified false statements or omissions.[11]

Turning to the second step of our two-part test, we conclude that probable cause would not have been negated if the misstatements or omissions identified in the amended complaint had been corrected. We assume that the additional information Mathis says should have been included in the Master Affidavit would have supported an inference that he did not knowingly assist AVW in committing a crime. But even with this additional information, a reasonable officer nonetheless could have concluded from the Master Affidavit that there was probable cause to believe that Mathis knowingly assisted AVW in committing a crime. *See Paez,* 915 F.3d at 1286 (explaining that "the presence of some conflicting evidence . . . will not vitiate a finding of probable cause").

From the Master Affidavit, a reasonable officer could have concluded there was probable cause because the Master Affidavit

---

[11] At oral argument, Mathis asserted that other specific statements in the Master Affidavit were false. But the amended complaint did not allege the falsity of these statements. Parties "are not permitted to simply 'insert' new allegations" into their complaints via appellate briefing. *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1262 (11th Cir. 2019) (en banc); *see also Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 705 (11th Cir. 2016) (explaining that an appellant "cannot [on appeal] use his briefing to add new allegations and argue that those new assertions support his cause of action").

described several incidents in which Mathis participated in the criminal scheme by helping to conceal and cover up information about how the internet cafes operated or the flow of the illegal proceeds.

First, when customer Hickson requested information from AVW about her winnings in the previous year, Mathis gave her incorrect information about the company's recordkeeping practices when he said that the only way for AVW to determine how much internet time a customer had purchased was to manually review paper records. In fact, this information was maintained on the company's computers or servers. A reasonable officer could have concluded that Mathis made this false statement to Hickson to prevent AVW from having to turn over detailed records that may have shown that gambling was occurring at the internet cafes.

Second, when Seminole County was considering an ordinance that would have banned the cafes, Mathis lobbied government officials on AVW's behalf, telling them the cafes' operations were permitted under Florida law. Mathis denied that AVW's customers included compulsive gamblers who were losing tens of thousands of dollars at the cafes and said customers usually spent only 20 or 30 dollars at a time. Notably, he made this statement after communicating with Hickson, who told Mathis that she had spent—and lost—tens of thousands of dollars at the cafes in a single year. A reasonable officer could conclude that Mathis knowingly provided the county commissioner with this incorrect information

about AVW's operations to conceal that gambling was occurring at cafes and to ensure that the cafes could continue operating.

Third, to operate a cafe in Leon County, a local ordinance required AVW to place $50,000 in a trust account to cover any prizes won. Mathis submitted an affidavit to Leon County certifying that that AVW had deposited $50,000 into the law firm's trust account. But, according to the Master Affidavit, the banking records for the law firm's trust account reflected no such deposit. From this incident, a reasonable officer could conclude that Mathis provided false information about AVW to a government official in an effort to conceal AVW's failure to comply with the law.

Fourth, to secure dismissal of a lawsuit in which AVW had been ordered to produce financial records, Mathis told a federal court that AVW and the affiliates had sold the cafes and no longer operated them.[12] In fact, the cafes had simply changed names. The same individuals owned the cafes, the same employees worked at the cafes, and Mathis remained their registered agent.[13] A

---

[12] Mathis also made a similar statement to a Florida agency.

[13] The amended complaint also alleged that the Master Affidavit misrepresented that the law firm "receive[d] proceeds derived . . . from the illegal gambling operations" at the cafes. Doc. 64 at ¶ 46. But the amended complaint alleged that the law firm received payments from AVW and its affiliates. *See also* Appellants' Br. at 30 (admitting that the law firm "receiv[ed] legal fees on an hourly basis for legal services actually performed"). Mathis's allegation that the Master Affidavit contained a misrepresentation related to the receipt of

20-13761                Opinion of the Court                31

reasonable officer could conclude that Mathis provided the court with false information about the cafes' ownership to ensure that AVW would not have to produce financial records that would have revealed the company's illegal operations and the flow of proceeds among AVW and the other entities.

Based on the Master Affidavit, a reasonable officer could have concluded that there was a substantial chance that Mathis knew that AVW was engaged in illegal activities and actively "participated" in the illegal scheme by "concealing the true nature" of AVW's business to ensure that the cafes could continue to operate with their illegal actions undetected.[14] Doc. 74-3 at 80. Indeed, Mathis concedes that Eslinger and Gibson were entitled to qualified immunity if there was arguable probable cause to believe that "[he] knowingly assisted" AVW in committing a crime. Appellants' Br.

---

fees boils down to an assertion that the law firm's receipt of fees was innocent because he simply performed legal work for AVW and did not assist AVW in any criminal conduct. But as we explain above, a reasonable officer could have had probable cause to believe that Mathis was actively assisting AVW in its criminal scheme by helping to cover up its illegal activities.

[14] In the decision reversing Mathis's criminal convictions, the Florida appellate court held that the trial court had improperly excluded Mathis's evidence and "effectively prevent[ed] him from arguing that he lacked the requisite mens rea for his offenses." *Mathis*, 208 So. 3d at 159. Even though it remanded the case for a new trial, the court nevertheless accepted that at trial the State could rely on evidence showing that Mathis had "knowingly misrepresented" or concealed information about AVW's business model to establish that he acted with the requisite *mens rea. Id.* at 164.

32                    Opinion of the Court                    20-13761

at 9. We agree and thus conclude that Eslinger and Gibson were entitled to qualified immunity.

## IV.    CONCLUSION

For the reasons set forth above, we affirm the district court's dismissal of the amended complaint.

**AFFIRMED.**